JAMES V. AND ESTHER R. COLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CLIFFORD M. AND ELIZABETH A. COLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5403-72, 802-73.    Filed September 25, 1975.

*John F. Kalben,* for the petitioners in docket No. 5403-72.
*Frank Jerome Brown,* for the petitioners in docket No. 802-73.
*Matthew W. Stanley, Jr.,* for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency of $21,372.39 in Clifford M. and Elizabeth A. Cole's joint Federal income tax for 1968, and a deficiency of $29,437.96 in James V. and Esther R. Cole's joint Federal income tax for 1968. The sole issue for decision is whether respondent erred in disallowing petitioners' deductions claimed for prepaid interest. Respondent, relying on Rev. Rul. 68-643, 1968-2 C.B. 76, and section 446,[1] spread the interest deduction ratably over the 40-month period for which the interest was paid. The cases have been consolidated for trial, briefing, and opinion.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

James V. and Esther R. Cole (James and Esther), husband and wife, lived in Bainbridge Island, Wash., when they filed their petition. They filed their 1968 Federal income tax return with the Internal Revenue Service Center at Ogden, Utah.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

Clifford M. and Elizabeth A. Cole (Clifford and Elizabeth), husband and wife, lived in Juneau, Alaska, until December 15, 1968, when they moved to Bainbridge Island, Wash. They lived in Bainbridge Island when they filed their petition. They filed their 1968 Federal income tax return with the District Director in Juneau. Clifford is the son of James and Esther.

Petitioners kept their books of account and prepared their income tax returns on the cash receipts and disbursements method of accounting.

In October and November 1968, Henry Broderick, Inc. (Broderick), a real estate brokerage firm, published an advertisement in several local newspapers in the Seattle area and in a newspaper in Anchorage, Alaska, which stated that Broderick had several investment properties for sale which were owned by parties who were willing to accept prepaid interest as part of the "front money." The advertisement did not mention any specific properties. On or about November 13, 1968, James read the advertisement in his local newspaper. He called Broderick and talked to James W. Youngren (Youngren), the individual broker whose name appeared in the advertisement.

This led to a meeting between James, Esther, and Youngren on November 15, 1968. At the meeting they discussed various pieces of property Youngren thought might interest James and Esther, and then they inspected four apartment buildings in and around Seattle. Three of the buildings were available in sales transactions involving prepaid interest, and the fourth was not, but was shown for comparison. One of the three apartment buildings was the Regency Apartments (Regency). At the meeting on November 15, 1968, Youngren gave James listing agreements and detailed investment analyses for the three apartment buildings available in prepaid interest transactions. James became interested in and eventually purchased (with his son Clifford) the Regency.

The Regency nonexclusive listing agreement was obtained from the owners on August 22, 1968, by James Budlong, who, like Youngren, was a representative of Broderick. The listing agreement contained various information about the property, which information had been provided by the owners, such as address, legal description, lot size, zoning, number of units, type of units, total square footage, type of heating, monthly rent roll, assessed valuation, and fixed expenses (i.e., real estate taxes,

insurance, and utilities). Youngren verified through outside sources the rent roll, assessed valuation, and fixed expenses.

The Regency detailed investment analysis was prepared by Youngren for petitioners. It contained an income tax analysis prepared for petitioners. Such analyses were not prepared as part of a general sales effort, but only for a specific purchaser and tailored to his specific situation.

Youngren thought the Regency was a good investment. It was located in an economically stable, prime rental location. The building contained a number of apartments with views that, due to the nature of the terrain, would not be obstructed in the future. The rents were at an acceptable level, and the purchase price per unit compared favorably to other buildings that had been sold in the same area (regardless of whether or not prepaid interest had been involved in the sales).

During the weekend of November 16 and 17, 1968, James and Esther reviewed the investment analysis and studied the economics relating to the potential purchase of the Regency. They decided to ask their son Clifford whether he wanted a 40-percent participation in the transaction.

On Wednesday, November 20, 1968, James telephoned Clifford in Alaska to determine whether he wanted to purchase an undivided 40-percent interest in the Regency. After some discussion Clifford agreed to the purchase. Later that day Clifford mailed his written commitment for 40 percent of the proposed purchase price of the Regency to James. The letter was received by James 2 days later.

On Friday, November 22, 1968, James and Esther visited Youngren at Broderick's offices for the purpose of making an offer on behalf of themselves and Clifford and Elizabeth to purchase the Regency. There, they offered to purchase the property for $400,000, signed an earnest-money agreement, and deposited a note payable to Broderick in the amount of $10,000. The note was accepted and an earnest-money agreement was signed by Youngren as agent for Broderick. The petitioners did not at any time during the negotiations directly contact the sellers.

The earnest-money agreement served as both an agreement and a receipt, and provided that the petitioners would not withdraw their offer during the 10-day period commencing November 22, 1968. Both the petitioners and Youngren con-

sidered it to be a binding agreement to hold the offer open. They did not, however, consider that the sellers were bound to accept the offer.

Youngren transmitted the $400,000 offer to the owners of the property. At the outset the owners insisted on receiving $435,000. After Youngren discussed the matter further with them, however, the owners agreed they would accept an offer of $410,000 if the "front money" were approximately $100,000.

Youngren contacted James and told him that his offer of $400,000 was not acceptable to the sellers. Youngren further informed James that he had been able to persuade the owners to accept $410,000 if James would agree to pay that purchase price and would consent to certain other minor modifications in the earnest-money agreement. James thereupon instructed Youngren to prepare a second earnest-money agreement in the amount of $410,000. This second earnest-money agreement required the prepayment of $100,010 interest prior to December 31, 1968. It further provided, in part, as follows:

> Purchaser offers to purchase the property on the terms noted in its present condition and this agreement is issued subject to the approval of the seller thereof within ten days from date. Purchaser agrees not to withdraw this offer during said period, or until earlier rejection thereof by seller. Purchaser agrees that written notice of acceptance given to agent by seller shall be notice to purchaser. If seller does not accept this agreement within the time specified, the agent will refund the earnest money upon demand.
> * * *
> The purchase price of $410,000 due under this contract shall be payable as follows: the sum of $100,010.00, including the earnest money deposit herein receipted for, shall be paid in cash at closing, which sums shall be paid as, and shall be treated by Seller as prepaid interest on the deferred balance, $410,000.00, for the period of time from closing to the date of the fortieth (40th) monthly installment due under the Real Estate Contract. This prepaid interest is computed on the basis of 8% per annum on the declining monthly balance from the date of closing to the date of said fortieth (40th) monthly installment. * * * Payment of the purchase price under said Real Estate Contract shall be as follows:
> 1. The sum of $2,300.00 per month, with the first payment being due thirty (30) days following closing, shall be paid for forty (40) consecutive months. Since interest for this period will have been fully prepaid, the entire amount of said monthly payment shall be credited to reduction of the principal balance due of $410,000.00.
> * * *
> It is mutually understood and agreed that the offer of Purchasers under this agreement is predicated upon the condition that the closing of the sale shall take place prior to December 31, 1968. Therefore, if for any reason other than

the fault of the Purchasers, the sale is not closed by December 31, 1968, then Purchasers shall have the option to declare this agreement null and void, have their earnest money refunded to them, and the rights and duties of the parties hereunder terminated.

The agreement was signed by James, Esther, and Youngren on Monday, November 25, 1968. Youngren immediately sent this second earnest-money agreement to the owners. The parties agreed that the note deposited with respect to the first earnest-money agreement would serve as earnest money for the second earnest-money agreement.

At the time of signing the second earnest-money agreement, both James and Youngren believed that their signatures on the document contractually bound both of them as of the date the agreement was executed. Youngren's policy was that if a potential buyer declined to obligate himself by signing an earnest-money agreement prohibiting the buyer from revoking the offer for a period of 10 days, Youngren would have the potential buyer sign an option agreement instead of an earnest-money agreement.

The customary business practice of Youngren in circumstances similar to those involved in this transaction was as follows: he would inform the purchaser of the property that his offer had been accepted by the seller prior to the time the seller signed the earnest-money agreement if (a) the seller had told Youngren that he had decided to accept the buyer's offer if it were of a specific amount of money and (b) Youngren decided that he could rely on the seller's intent and integrity in performing the contract.

On November 25, 1968, Youngren told James that he had a deal with the sellers regarding the basic business points of the sale. Youngren believed that when James and Esther signed the second earnest-money agreement, they were promising to hold open their offer to purchase the property for 10 days. He also believed that as a result of the agreement, he had an obligation to present the petitioners' offer to the owners of the Regency.

On Monday, December 2, 1968, the owners signed the second earnest-money agreement. Subsequently, on December 18, 1968, pursuant to the second earnest-money agreement, a real estate purchase and sale contract was executed between petitioners and the owners. This contract contained an express provision requiring petitioners to prepay $100,010 interest. The contract

contained no provision for a refund of any unearned interest in the event of an early payment of principal or for any other reason.

On December 23, 1968, the purchase of the Regency was closed. The closing transaction was administered by Transamerica Title Insurance Co. of Seattle, Wash. Petitioners were represented by Broderick. As required by the agreement, $100,010 was paid prior to December 31, 1968.

The commission for the sale of the Regency was paid by the sellers. It was divided between Broderick and its salesmen, Budlong and Youngren.

In May 1969, James and Clifford signed a document evidencing the agreement between them to share the purchase price and ownership of the Regency. The petitioners were not advised or represented by legal counsel with respect to the transactions which are the subject matter of this litigation prior to or during the purchase of the Regency.

During the years 1963 through 1968, James, Clifford, and one Thomas O. Paddock each owned a one-third interest in a partnership known as Cole & Paddock. The partnership did construction and excavation work. Petitioners' major source of funds for the downpayment on the purchase of the Regency was settlement payments made in 1968 to the partnership. These payments were made by the Alaska Department of Highways in settlement of a dispute arising out of work done on the Snow River Project by Cole & Paddock during the period 1963 to 1965. The partnership, a cash basis entity, was in existence after 1965 primarily to collect payments on projects completed prior to that date. James was notified on October 23, 1968, that the Snow River Project dispute had been settled. No payments related to this work were received during the years 1963 through 1965. James and Clifford each received $46,463.80 as their share of the settlement payments made to Cole & Paddock. These payments flowed through the partnership to the petitioners and included some interest that was earned in the years prior to 1968.

In addition to a one-third interest in the Cole & Paddock partnership, James had earned income in 1968 consisting of $14,400 salary and $10,000 bonus from Cole & Paddock, Inc., a corporation, and a few thousand dollars of investment income.

For the calendar years 1964 to 1971, James and Esther reported gross income, adjusted gross income, and taxable income in the amounts set forth below:

| Year | Gross income | Adjusted gross income | Taxable income |
|------|-------------|----------------------|----------------|
| 1964 | $82,611.51 | $82,611.51 | $80,411.51 |
| 1965 | 63,758.26 | 63,758.26 | 53,344.88 |
| 1966 | 53,471.13 | 53,471.13 | 43,685.39 |
| 1967 | 29,493.89 | 29,493.89 | 24,147.49 |
| 1968 | 22,011.86 | 21,316.76 | 18,211.85 |
| 1969 | 38,699.95 | 36,729.00 | 22,561.80 |
| 1970 | 8,137.87 | 4,507.02 | 904.31 |
| 1971 | 3,242.67 | 3,242.67 | --- |

For the calendar years 1964 to 1971, Clifford and Elizabeth reported gross income, adjusted gross income, and taxable income in the amounts set forth below:

| Year | Gross income | Adjusted gross income | Taxable income |
|------|-------------|----------------------|----------------|
| 1964 | $71,756.90 | $71,756.90 | $68,359.75 |
| 1965 | 52,959.40 | 52,959.40 | 40,872.20 |
| 1966 | 59,824.91 | 59,824.91 | 51,238.61 |
| 1967 | 37,621.89 | 37,621.89 | 28,945.34 |
| 1968 | 40,798.27 | 40,798.27 | 32,625.08 |
| 1969 | 8,311.10 | 8,311.10 | --- |
| 1970 | 4,560.67 | 4,560.67 | --- |
| 1971 | 8,738.24 | 8,738.24 | 1,137.04 |

The petitioners invested in the Regency for many reasons, among them being (a) a desire to deduct the prepaid interest currently; (b) the economic analysis of the property prepared by Youngren estimating that the property would yield over $8,000 income per year on the $100,010 downpayment, 2 percent above the average return generally obtainable by an investor in 1968; (c) petitioners' belief that the purchase price was low in relation to the value of the property; (d) that the apartment building was located on Queen Anne Hill, a stable area with respect to long-term real estate investments; and (e) petitioners' belief that their investment in real estate would be a protection against inflation.

As of the date of trial, petitioners still owned the Regency. At the time of trial, the cost of building an apartment building similar to the Regency was over 25 percent more than petitioners' purchase price. Although petitioners have not listed the property for sale since 1968, petitioners have been approached by real estate agents to sell the property and have declined to do so.

Until November 26, 1968, respondent's position with respect to prepaid interest transactions such as the one described above

was contained in I.T. 3740, 1945 C.B. 109; it allowed a current deduction under section 163 for the prepayment of up to 5 years' interest. Both Youngren and James were aware of the Commissioner's position contained in I.T. 3740. James discussed respondent's position with Youngren and relied on the ruling in entering into the Regency transaction.

On November 26, 1968, the day after petitioners and the broker signed the second earnest-money agreement and 6 days before the owners did so, respondent, without prior public notice, issued Rev. Rul. 68-643, 1968-2 C.B. 76. This ruling declared:

> Section 446(a) of the Code provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Section 446(b) of the Code provides, in part, that if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. * * *

> In view of certain abuses which have arisen with respect to prepayment of interest by taxpayers using the cash receipts and disbursements method of accounting, the Service has reexamined its position in I.T. 3740. The Service now concludes that the deduction of prepaid interest in the year of payment by a taxpayer employing the cash receipts and disbursements method of accounting may not result in a clear reflection of income for the taxable year of payment. A deduction for interest paid in advance on each indebtedness for a period not in excess of 12 months of the taxable year immediately following the taxable year in which the prepayment is made will be considered on a case by case basis to determine whether a material distortion of income has resulted. Some of the factors to be considered in determining whether the deduction of prepaid interest gives rise to a material distortion of income include but are not limited to the amount of income in the taxable year of payment, the income of previous taxable years, the amount of prepaid interest, the time of payment, the reason for prepayment, and the existence of a varying rate of interest over the term of the loan. If interest is prepaid for a period extending more than 12 months beyond the end of the current taxable year, the deduction of such prepaid interest in the taxable year of payment will be considered as materially distorting income. Where a material distortion of income has been found to result from the deduction of prepaid interest, the Service will require the taxpayer to change his method of accounting with respect to such prepaid interest in order to allocate it over the taxable years involved.

> In view of the foregoing, I.T. 3740 is revoked. * * *

The ruling, however, contains the following exceptions:

> this Revenue Ruling will be applied without retroactive effect to interest prepayments for periods not in excess of five years made prior to November 26, 1968 by taxpayers employing the cash receipts and disbursements method of accounting. This Revenue Ruling also will be applied without retroactive effect to an interest prepayment for a period not in excess of five years made on or

after November 26, 1968, by a taxpayer employing the cash receipts and disbursements method of accounting, pursuant to a legal obligation incurred prior to such date to make such prepayment. * * *

On their 1968 joint Federal income tax return, James and Esther deducted as an interest expense the amount of $58,947.60, representing approximately 60 percent of the $100,010 prepaid interest payment. Clifford and Elizabeth deducted as an interest expense on their 1968 joint Federal income tax return the amount of $39,292.50, representing approximately 40 percent of the $100,010 prepaid interest payment.

As to James and Esther, respondent disallowed all but $485.25 of the deduction, asserting that the obligation giving rise to the interest was entered into subsequent to November 26, 1968, and that the claimed deduction materially distorts income. Instead, the interest was allocated ratably over the 40-month obligation period. Identical reasoning was given in disallowing all but $323.50 of the interest deduction claimed by Clifford and Elizabeth.

OPINION

On November 25, 1968, petitioners made a written offer to purchase the Regency Apartments via a 40-month installment contract calling for a total principal amount of $410,000 with immediate payment of $100,010 prepaid interest. Petitioners are on the cash receipts and disbursements method of accounting. On November 26, 1968, the Internal Revenue Service promulgated Rev. Rul. 68-643,[2] a ruling which revoked respondent's long-standing position[3] allowing cash basis taxpayers to deduct under section 163 up to 5 years of prepaid interest in the year actually paid. The new ruling was by its own terms only effective prospectively; if the prepaid interest were paid by November 26, 1968, or paid under "a legal obligation incurred prior to [November 26, 1968]," respondent would apply his prior long-standing position. On December 2, 1968, the sellers of the Regency accepted petitioners' offer in all of its terms, creating a binding executory contract. On December 23, 1968, the closing occurred. On their 1968 Federal income tax return petitioners deducted the amounts paid as prepaid interest.

---

[2] 1968-2 C.B. 76.
[3] I.T. 3740, 1945 C.B. 109.

Respondent, contending that Rev. Rul. 68-643 is both applicable and valid and that petitioners' prepaid interest deductions created a material distortion of their income, denied substantially all of petitioners' deductions for prepaid interest. Instead, respondent allocated the interest deduction ratably over the 40-month installment period. Petitioners resist this treatment.

### 1. *Legal Obligation Not Incurred Prior to Nov. 26, 1968*

Rev. Rul. 68-643 provides in part that it will be applied without retroactive effect to an interest prepayment made pursuant to a legal obligation incurred prior to November 26, 1968. The briefs of the parties include extensive argument about whether or not the written offer made on November 25, 1968, constituted a contract and hence "a legal obligation" incurred before November 26, 1968. Petitioners argue that the offer was really a contract between Broderick and petitioners, supported on both sides by consideration, and that the sellers were third-party beneficiaries of this contract. This theory finds consideration on the one side in the services furnished to petitioners by the broker and on the other by the promise to keep the offer open for 10 days. Respondent characterizes this as an attempt by petitioners to promote a mere offer, revocable at any time prior to acceptance, to the status of a contract. We agree.

The simplest and best way of viewing the transaction is as an offer made via a broker who did considerable work in the hope and expectation of gaining a commission upon the consummation of a sale. The contract was formed not on November 25, 1968, when the offer was made, but on December 2, 1968, when the sellers accepted and signed the earnest-money agreement. The buyers' agreement to hold their offer open for 10 days was unsupported by consideration. It was an offer which could have been unilaterally revoked even during the 10-day period, prior to the sellers' acceptance on December 2, 1968. *Hill v. Corbett,* 33 Wash. 2d 219, 204 P. 2d 845 (1949); see Shattuck, "Contracts in Washington, 1937-1957," 34 Wash. L.Rev. 24, 41-42 (1959); 1 Williston, Contracts secs. 61A, 61B (3d ed. 1957); 1-A Corbin, Contracts secs. 42, 263 (1963); 1 Restatement of Contracts secs. 34, 46. Compare the rule under the U.C.C.'s notion of "firm offer" as between "merchants." Wash. Rev. Code sec. 62A.2-205

(1974). Hence there was no contract before November 26, 1968, the effective date of the revenue ruling.

## 2. *Equitable Estoppel*

Petitioners argue that the application of Rev. Rul. 68-643 to them is retroactive and so grossly unfair that respondent is estopped to deny the deduction.

Rev. Rul. 68-643 is not being applied to petitioners retroactively. By its own terms, Rev. Rul. 68-643 is not applicable to any taxpayer who prior to November 26, 1968, incurred a legal obligation to prepay interest. Petitioners had not entered into a binding contract on or before November 26, 1968.

Furthermore, even if Rev. Rul. 68-643 had been promulgated to have retroactive, rather than prospective, application to all taxpayers, respondent would not be estopped. As the Supreme Court stated in *Dixon v. United States*, 381 U.S. 68, 72-73 (1965):

> In *Automobile Club of Michigan* v. *Commissioner, supra,* [353 U.S.] at 183-184, [77 S. Ct. at 709] we held that the Commissioner is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions. He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake. See *Manhattan General Equipment Co.* v. *Commissioner,* 297 U.S. 129 [56 S.Ct. 397, 80 L.Ed. 528]. This principle is no more than a reflection of the fact that Congress, not the Commissioner, prescribes the tax laws. The Commissioner's rulings have only such force as Congress chooses to give them, and Congress has not given them the force of law. * * * [Fn. ref. omitted.]

## 3. *Validity Of Prepaid Interest Deduction*

Petitioners claim they are entitled to deduct the entire amount of interest prepaid in 1968, asserting that no material distortion of their income resulted therefrom. Respondent contends that the prepaid interest is not deductible in the year paid (1968) because it does materially distort petitioners' income, and, because prepaid interest is a valuable asset and must be prorated over the term of the loan.

Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

In 1939 this Court decided *John D. Fackler*, 39 B.T.A. 395, in which we permitted the deduction of 1 and 2 years' prepaid interest in the face of respondent's arguments that it would

distort income and that the prepayment created an asset which should have been capitalized. Again, in *Court Holding Co.*, 2 T.C. 531, 536 (1943), appealed on another issue, revd. and remanded 143 F. 2d 823 (5th Cir. 1944), and in turn revd. 324 U.S. 331 (1945), we allowed a deduction for 1 year's prepaid interest. In 1945 respondent in I.T. 3740, 1945 C.B. 109, concluded that a cash basis taxpayer could deduct up to 5 years' prepaid interest.

Thereafter a large number of transactions occurred which were structured to take advantage of the tax benefits created by the prepaid interest rule laid down in I.T. 3740. On November 26, 1968, respondent issued Rev. Rul. 68-643, 1968-2 C.B. 76, reversing his 23-year-old policy regarding the deductibility of prepaid interest.

Rev. Rul. 68-643 relies upon respondent's authority under section 446(b) to reject a taxpayer's "method of accounting" which "does not clearly reflect income" and in such cases to compute his income "under such method as, in the opinion of the Secretary or his delegate does clearly reflect income." Rev. Rul. 68-643 states that the deduction by a cash method taxpayer "may not result in a clear reflection of income for the taxable year of payment." In such case, the ruling requires deduction of the prepaid interest "over the taxable years involved," (evidently, the years for which the interest was paid). The ruling states that respondent would consider any prepayment for a period extending more than 12 months beyond the end of the current taxable year "as materially distorting income" and he would require the spreading of the deduction over the years involved. In cases of a prepayment for a shorter period, the respondent will consider them "on a case by case basis to determine whether a material distortion of income has resulted."

The ruling set forth certain factors which would "be considered in determining whether or not the deduction of prepaid interest for such a shorter period gives rise to a material distortion of income." Such factors were to include but not be limited to "the amount of income in the taxable year of payment, the income of previous taxable years, the amount of prepaid interest, the time of payment, the reason for prepayment, and the existence of a varying rate of interest over the term of the loan."

The ruling, as we have noted, was made nonretroactive.

Our first occasion to consider the deductibility of prepaid interest after respondent revised his position came last year in

*Andrew A. Sandor,* 62 T.C. 469 (1974), a reviewed opinion, on appeal to the Ninth Circuit. In that decision we disallowed the deduction the taxpayer had claimed for 5 years of prepaid interest paid on December 27, 1968. The note was payable to a bank and if the petitioners had paid the principal before due, they would have received a refund of the unearned portion of the prepaid interest.

While the case before us differs in some respects from *Sandor,* we consider the principles set forth in that opinion to be controlling here. In *Sandor* we recognized that the taxpayer's right to deduct items under the method of accounting which he regularly uses is circumscribed by the Commissioner's authority to change the taxpayer's accounting method, if such method does not clearly reflect income.[4] Sec. 446(a), 446(b), and 461(a). For these purposes, "the term 'method of accounting' includes not only the overall method of accounting of the taxpayer, but also the accounting treatment of any item." Sec. 1.446-1(a), Income Tax Regs. See also *Peoples Bank & Trust Co.,* 50 T.C. 750 (1968), affd. 415 F. 2d 1341 (7th Cir. 1969).

The Commissioner has broad discretion in determining whether the taxpayer's method of accounting clearly reflects his income. *Commissioner v. Hansen,* 360 U.S. 446 (1959); *Fort Howard Paper Co.,* 49 T.C. 275 (1967). Moreover, the taxpayer has a heavy burden in overcoming respondent's determination. *Fort Howard Paper Co.,supra; Photo-Sonics, Inc.,* 42 T.C. 926 (1964), affd. 357 F. 2d 656 (9th Cir. 1966). Even if the accounting method used by the taxpayer is consistent with generally accepted accounting principles, it may not so clearly reflect income as to be binding upon the Commissioner. *American Automobile Association v. United States,* 367 U.S. 687 (1961); *Fort Howard Paper Co., supra; Andrew A. Sandor, supra.*

---

[4] The requirement that the taxpayer claim his deductions in a manner which will clearly reflect income is a long-established statutory rule. Sec. 200(d) of the Revenue Act of 1924 provided:

The deductions and credits provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred", dependent upon the method of accounting upon the basis of which the net income is computed under section 212 or 232, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period.

Sec. 200(d) became sec. 43 of the 1939 Code, which in turn was the predecessor of sec. 461 of the 1954 Code. For a more extensive discussion of this development see *Andrew A. Sandor, supra.* See also Asimow, "Principle and Prepaid Interest," 16 U.C.L.A. L. Rev. 36 (1968-69).

In disallowing petitioner's interest deductions for 1968, respondent places primary emphasis on Rev. Rul. 68-643, 1968-2 C.B. 76. We again decline to place a stamp of approval on everything said in that ruling or on the application of that ruling to all cases. *Andrew A. Sandor, supra; G. Douglas Burck,* 63 T.C. 556 (1975), on appeal to the Second Circuit. See *Estate of Grace E. Lang,* 64 T.C. 404, 407 (1975). However, as noted, the taxpayer has a heavy burden in overcoming respondent's determination that treatment of prepaid interest fails to clearly reflect income. Thus, this Court may well generally sustain the disallowance of an interest deduction "prepaid for a period extending more than 12 months beyond the end of the current taxable year," but we cannot say categorically that we will do this in every conceivable case. In the instant case, however, we share respondent's view that the $100,010 interest deductions taken by petitioners in 1968 resulted in a material distortion of income, and thus did not clearly reflect their income for that period.[5]

There is no question that petitioners' income picture was materially affected by the large interest deductions in 1968. The deduction of $58,947.60 by James and Esther, and of $39,292.50 by Clifford and Elizabeth represented interest prepaid for a period of 40 months. Although only 8 days out of the entire 1,223-day period (40 months) for which interest was prepaid fell within 1968, all of the interest attributable to this period was deducted in 1968.[6] We believe that, at least under the circumstances herein, this is enough to demonstrate that petitioners' accounting of the prepaid interest here involved does not clearly reflect income.[7]

---

[5] Admittedly, the clear reflection of income and material distortion of income concepts do not lend themselves to the establishment of clearly defined categories. However, the transaction entered into by petitioners here had a significant impact on their income picture. Moreover, the distortion is substantially beyond what might normally be expected in the commercial world, even under the cash method of reporting income, absent the utilization of a particular tax consequence as a central feature of the transaction.

[6] Put another way, the percentage of the prepayment period falling in 1968 was a little more than one-half of 1 percent, yet 100 percent of the prepaid interest was deducted in 1968.

[7] However, as our findings make clear, the income of petitioners (and thus their marginal tax rates) declined sharply over the 3-year period 1969-71; and in view of the impending retirement of James and the reduced activity in the construction business, we believe this decline was anticipated. Furthermore, without the deduction for prepaid interest, petitioners' income in 1968 would have been substantially higher than their income in the 3 preceding tax years. Petitioners bunched a large deduction in an earlier year where it would do them the most good.

Moreover, we note the similarity to *Sandor* in that the taxpayer sought out a transaction which would produce an unusually large deduction in a high income year. While the test of clear reflection of income is intended to be an objective one, we believe the transaction should be subject to special scrutiny when these circumstances are present.

Petitioners argue that the contract settlement received in 1968 bunched income attributable to earlier years in 1968, resulting in a distortion that they eliminated by prepaying interest in 1968. The difficulty with this argument is that Congress specifically dealt with the problem of bunched income by enacting the income averaging provisions. (See secs. 1301 to 1305.) Due to the limitations Congress specifically included in these provisions, petitioners may perceive the relief to be inadequate. Nevertheless, Congress enacts the laws and this is all that has been provided. Self-help adjustment of these perceived inadequacies on an ad hoc basis by bunching deductions in 1968 is certainly not permissible.

Petitioners also argue that this case should be distinguished from *Sandor* on the grounds that in *Sandor*, the taxpayer could have received a rebate of the unearned portion of the prepaid interest if the principal was paid prior to its due date, whereas here no such refund was possible. We do not believe, however, that the inability of the borrower to have any part of his prepaid interest refunded should change the result in *Sandor*. Petitioners' income picture is no less distorted or more clearly reflected on this account.[8] To hold otherwise would mean that a taxpayer could prepay interest for a period of any length (e.g., 20 years) and deduct it in the year of payment, as long as he was willing to forego a refund of prepaid interest for advance payments of principal. This is precisely the kind of result that the "clearly reflect income" language was designed to avoid.[9]

---

[8] Moreover, we do not believe that the economics of the transaction have been changed significantly enough to effect the tax result. Since he is unable to demand a refund of interest by making an advance payment of principal, the rational borrower will simply not make principal payments far in advance of their due dates. The unavailability, as a practical matter, of a prepayment option is more than compensated for by the tax savings associated with the material distortion of income. Additionally, the fact that the lender is getting the early use of interest payments will presumably be reflected in the price, if the lender is also the seller, the interest rate, or in other points of negotiation.

[9] See H. Rept. No. 179, 68th Cong., 1st Sess. (1924), 1939-1 (Part 2) C.B. 249.

We believe that the principles enunciated in *Sandor,* as applied to the facts of this case, require us to sustain respondent's determination.[10]

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HALL, *J.,* concurring: There can be no doubt that the majority reaches the proper result. I think it is time, however, that we expressly discarded whatever shreds of life may remain in the idea that prepaid interest stands on any different footing than prepaid rent. Rather than engage in an essentially illusory examination for "material distortion of income," I would simply hold that prepaid interest, like prepaid rent, creates an asset of value, the cost of which may be deducted, if at all, only during its useful life.

Prepaid interest is indistinguishable in logic or legislative history from prepaid rent. Prepaid rent purchases the use of property; prepaid interest the use of money. No doubt, as the majority observes, money differs from other property, but the relevance of that difference to the question of deductibility is not apparent. In *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281, 285 (1944), the Supreme Court stated that "a tenant would not be compelled to accrue, in the first year of a lease, the rental liability covering the entire term nor would he be permitted, if he saw fit to pay all the rent in advance, to deduct the whole payment as an expense of the current year." And in *University Properties, Inc.,* 45 T.C. 416 (1966), affd. 378 F. 2d 83 (9th Cir. 1967), we held, without inquiry into the degree of materiality of distortion of income involved, that a cash method taxpayer may

---

[10] Respondent suggests on brief that the deduction in this case may be disallowed on the theory that prepaid interest is an asset amortizable over its useful life, like prepaid rent. This may be an instance where a page of history is worth a volume of logic. Prepaid interest has been treated differently from prepaid rent for more than one-third of a century. Additionally, money plays a unique role in our commercial and personal affairs that is different in many respects from property, and respondent has recognized this in his treatment of the deductibility of interest under the Rule of 78's (Rev. Rul. 72-100, 1972-1 C.B. 122) and the deduction of nonrefundable interest in the form of points (Rev. Rul. 69-582, 1969-2 C.B. 29). While the argument has the appeal of logical symmetry, if carried to its logical conclusion, it would invalidate the position taken in both of those rulings. Given the ubiquitous role of money in the nation's economic life, it might lead to unforeseen consequences that, in view of the history of the treatment of prepaid interest, can be more appropriately considered in another forum. See H. Rept. No. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 246, and the comments thereon in *Andrew A. Sandor,* 62 T.C. 469, 479 (1974).

not deduct prepaid rent. As we pointed out in *Andrew A. Sandor*, 62 T.C. 469, 478-479 (1974), on appeal to the Ninth Circuit, the legislative history of section 200(d) of the Revenue Act of 1924 made no distinction between the possible distortion of income resulting from prepaid rent and prepaid interest. We there said "We think that the parallel between prepaid rent and prepaid interest is inescapable." 62 T.C. at 480.

I have no objection to respondent's use of the "material distortion" test as an administrative matter, to put taxpayers on notice of the circumstances under which he will on audit disallow a deduction claimed for prepaid interest. However, I find no adequate statutory sanction for the proposition that as a matter of law prepaid interest, unlike prepaid rent, can be deducted by a cash method taxpayer absent "material distortion." Therefore, I would make no inquiry into the materiality of distortion, but would simply disallow the challenged deduction. The majority relies on "more than one-third of a century" of history in distinguishing prepaid rent from prepaid interest. However, in *Sandor* we cut ourselves adrift from that history, and therefore should not be appealing to it here.

My concern with the majority's approach is not, however, limited to the view that we should not keep flickering for cash method taxpayers some largely illusory flame of hope that they might be successful in deducting prepaid interest under certain circumstances. I am also concerned by the large inroads which the majority's opinion inferentially makes upon taxpayer's right to use the cash method of accounting. The use of the cash method has not heretofore been held conditional upon its results being reasonably similar to those of accrual accounting. Yet if prepaid interest is, as a general rule, a legitimate deduction for a cash method taxpayer, what else are we to make of the proposition that such a deduction can be disallowed where it materially distorts income? The "income" so distorted cannot be that resulting from application of the cash method—for on that method the amounts were indeed paid, and the majority does not hold an asset was created. Rather, "income" as measured by cash method accounting is compared with the results of some inferentially superior method of measuring "income." But since "income" is not a self-defining term, where do we find the superior source? Evidently, in accrual accounting.

I do not believe that respondent has, nor has he claimed, the generalized power to take what he likes of cash method accounting and reject what he dislikes merely because it varies from the results of accrual accounting. Here respondent accepts the results of forward bunching of petitioners' income, but rejects as distortion the attempt to achieve offsetting results through an interest prepayment. Neither the statute, however, nor any of the cases cited, except possibly *Sandor,* so qualify the taxpayer's right, where he has properly adopted the cash method. Where a variance from the result of accrual accounting exists solely as a result of taxpayer's application of the cash method, no taxpayer has heretofore been denied such a result solely because of the extent of such variance. In *Peoples Bank & Trust Co.,* 50 T.C. 750 (1968), affd. 415 F. 2d 1341 (7th Cir. 1969), an accrual basis taxpayer was properly precluded from deducting interest payable before the events establishing the liability had become fixed. In *Commissioner v. Hansen,* 360 U.S. 446 (1959), accrual method taxpayers were required to include in income certain "Dealers' Reserve Accounts" to which they were held to have had fixed rights. In *Fort Howard Paper Co.,* 49 T.C. 275 (1967), we refused to disturb the accrual basis taxpayer's long-standing inventory costing method. In *Photo-Sonics, Inc.,* 42 T.C. 926 (1964), affd. 357 F. 2d 656 (9th Cir. 1966), the accrual basis taxpayer was required to change an erroneous method of inventory costing. In *American Automobile Association v. United States,* 367 U.S. 687 (1961), an accrual basis taxpayer was required to include in its income amounts it earned and held under claim of right. In none of these cases was a cash method taxpayer precluded from the results of proper use of the authorized cash method. So to construe respondent's powers under section 446 is effectively to emasculate the well-recognized right of taxpayers to the use of that method, with whatever favorable or adverse tax consequences follow.

Not only, however, are there no prior cases permitting such encroachment on the cash method, but the Supreme Court has already rejected the majority's permissive interpretation of respondent's powers. *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281 (1944). In *Security Flour Mills Co.* the Court construed the clause in section 43 of the Revenue Act of 1934, "unless in order to clearly reflect the income the deductions or

credits should be taken as of a definite period." The Court said of that clause:

But we think it was not intended to upset the well-understood and consistently applied doctrine that cash receipts or matured accounts due on the one hand, and cash payments or accrued definite obligations on the other, should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer. [321 U.S. at 285-286.]

The Court also said:

The rationale of the system is this: "It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation."

This legal principle has often been stated and applied. The uniform result has been denial both to Government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount.

But the petitioner urges that § 43 has altered the rule so that a hybrid system, partly. annual and partly transactional, may, within administrative discretion, be substituted for that of annual accounting periods. It urges that the change was due to the desire of Congress to prevent distortion of true income. This must mean distortion of true income, not of a given year, but, in the light of ultimate gain, from a series of transactions over a period of years, growing out of, or in some way related to, an initial transaction in the taxable year. The very section on which petitioner relies, however, reiterates the adherence of Congress to the system of annual periods of computation.

As we said in *Dixie Pine Products Co.* v. *Commissioner, supra,* referring to a section identical with § 43 now under consideration, "The provisions of the Revenue Act of 1936 worked no significant change over earlier Acts respecting the permissible basis of calculating annual taxable income."

We are of opinion that the purpose of the language which Congress used was not to substitute, whenever in the discretion of an administrative officer or tribunal such a course would seem proper, a divided and inconsistent method of accounting not properly to be denominated either a cash or an accrual system. [Fn. refs. omitted; 321 U.S. at 286-287.] [1]

---

1 It might be contended that the *Security Flour Mills Co.* language is made obsolete by subsequent congressional adoption of what is now sec. 446(c)(4), authorizing the Secretary to prescribe regulations permitting hybrid methods. However, the taxpayer's right, under such circumstances, initially to adopt a hybrid method does not entitle the Commissioner to place a cash method taxpayer on a hybrid method. Taxpayers have at all times had the right to adopt an accrual method, but it has never been held that respondent has the arbitrary power to place any cash method taxpayer on the accrual basis merely because the respondent determines that accrual rather than cash method accounting more clearly

I see no material difference between the former section 43 and present Code section 446(b) which would justify us in allowing respondent to do what he was so clearly prohibited from doing in *Security Flour Mills Co.*

We, too, have heretofore rejected the notion of enforced use of hybrid cash-accrual accounting methods to "clearly reflect" the income of a cash method taxpayer. In *Sol C. Siegel Productions, Inc.*, 46 T.C. 15 (1966), we said:

> Finally, the Commissioner seeks to support his position by reliance upon section 446(b) of the 1954 Code. His theory is that the $300,000 must be included in petitioner's income for the fiscal year ending May 31, 1961, in order to "clearly reflect income." In effect the Commissioner has attempted to place petitioner on an accrual basis of accounting in respect of the $300,000 item, without otherwise disturbing petitioner's cash basis. Of course, the Commissioner has broad discretion under section 446(b), and the burden is upon the taxpayer to show that there has been an abuse of that discretion. *Idaho First National Bank* v. *United States*, 265 F. 2d 6, 9 (C.A. 9). We think the record herein clearly establishes that there is no ground whatever for reliance upon section 446(b) and that resort thereto would amount to an abuse of discretion. [Fn. ref. omitted; 46 T.C. at 24-25.]

The only legitimate question here is not whether claiming a deduction for prepaid interest creates an undue disparity in a particular case between the results of cash method and accrual method accounting. If the cash method is properly used, the disparity is not a *distortion* of income but merely the consequences of proper use of a permissible method of *measuring* income. The legitimate question is whether prepaid interest is a proper deduction *at all* for a cash method taxpayer. I would hold that in the light of *Sandor* it is not. But the majority's rationale herein for reaching its result is not only precluded by authority, but would potentially trench deeply upon the tax law's predictability. It would render largely illusory the right to security in the use of cash method accounting generally.

SCOTT, *J.*, agrees with this concurring opinion.

---

reflects his income. The addition of the hybrid method to the permissible range of choices does not by itself empower the respondent to require a taxpayer properly applying the cash method to shift to the hybrid method.