WILLIS H. MILLER AND EVA M. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7882-73.     Filed December 22, 1975.

*Frederick H. Torp, Edward L. Epstein,* and *Jon W. Nickel,* for the petitioners.

*Jan R. Pierce,* for the respondent.

### OPINION

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income tax of $29,055.06 for 1970 and $5,465.67 for 1971. Due to concessions, the sole issue to be decided is whether the petitioners are entitled to deduct, as ordinary and necessary business expenses, the payments made to an agricultural marketing cooperative with respect to the services performed by such cooperative for its members.

All the facts have been stipulated, and those facts are so found.

The petition herein was timely filed by Willis H. Miller and Eva M. Miller, his wife, who, on the date of the filing of such petition, resided in Hood River, Oreg. They filed their joint Federal income tax returns for 1970 and 1971, using the cash method of accounting, with the Internal Revenue Service Center, Ogden, Utah.

The petitioners were engaged in the business of fruit farming for many years, including the years in issue. They were members of Diamond Fruit Growers, Inc. (Diamond or the cooperative).

Diamond was an agricultural marketing cooperative classified as a farmers' cooperative under section 521(b)(1) of the Internal Revenue Code of 1954.[1] Its primary purpose was to process and market the produce of its members. Such produce included fresh fruit packed in various grades and sizes, canned fruit, vegetables, and other processed items.

Diamond operated on a cooperative basis for the mutual benefit of its members. Upon accepting delivery of produce from its members, the cooperative became the members' agent and had full power and authority to process and market the produce.

Diamond's relationship with its members was governed by its articles of incorporation, bylaws, and a grower's contract. Membership was limited to persons who produced agricultural commodities. The board of directors (board), which managed the business of the cooperative, was required to approve all new members. Membership became effective upon payment of a membership fee and execution of a uniform cooperative marketing contract (marketing contract). The marketing contract gave the cooperative the exclusive right to market a member's fruit grown within specified geographical boundaries.

The cooperative used the pool method of accounting to determine a member's share of the net proceeds of a particular crop. A pool was created every year for each type of fruit produced by the members. The costs of packing and marketing the fruit in each pool were separately computed. From the time the fruit was delivered to the cooperative until the pool was closed, the cooperative credited the accounts of the members in the pool with their proportionate share of the estimated net proceeds. Such credits could then be withdrawn by the members. The cooperative retained its estimated costs for services.

After all items of income and expense had been included in the accounting pool, the pool was closed. Each member in the pool was then credited or charged with his proportionate share of the net income or loss for that pool according to his patronage. Pursuant to Diamond's bylaws, it could charge its members for any loss incurred.

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect for the years in issue.

The bylaws provided in part that:

All commodities delivered to the Cooperative by its members for marketing, storage, processing, or other handling shall be so handled at cost, and the proceeds of the sale thereof, less the Cooperative's costs and expenses shall be equitably allocated to the members involved, according to patronage. * * * The Board may assess charges to be made and collected for the Cooperative's services in advance of determination of the actual cost thereof to the Cooperative, as hereinafter provided.

Pursuant to such authority, the board adopted a policy whereby a member could pay, in the year the produce was delivered to Diamond, the estimated cost of the cooperative's services for the marketing of his produce. Diamond allowed a discount of 3 percent to the members for such payments made in 1970 and 1971. The discount was increased to 6 percent in 1972. The estimated charge was based upon prior years' experience. Diamond allowed members to pay such estimated charges or any lesser amount expressed as a fixed dollar amount per packed box of fruit delivered to the cooperative. During 1971, 32 of the cooperative's 450 members made such payments.

The packing and marketing of fresh and canned items began shortly after the crop was delivered and continued until the pool was closed, usually in the next year. The cooperative paid or incurred substantially all the expenses connected with packing and marketing the members' crop in the year the crop was packed. However, it did not know the exact amount of such expenses until they were allocated among all participating members when the pool was closed in the following year.

Prior to September 30, 1970, the petitioners delivered their entire crop of D'Anjou and Bartlett pears to the cooperative, and it packed all of such pears before the end of that calendar year. Prior to September 30, 1971, the petitioners delivered all of their D'Anjou pear crop harvested that year to the cooperative, and these pears were packed prior to the end of that calendar year.

The following table lists the payments made by the petitioners to the cooperative for packing and marketing their crops each year and the actual costs which were subsequently computed for such services:

| Year crop harvested | Payment by petitioners | Cooperative's actual costs |
|---|---|---|
| 1965 _____ | $15,000 | $46,691.91 |
| 1966 _____ | 30,000 | 63,363.44 |
| 1967 _____ | 0 | 47,797.88 |
| 1968 _____ | 39,000 | 83,980.71 |
| 1969 _____ | 30,000 | 52,604.22 |
| 1970 _____ | 57,500 | 60,448.84 |
| 1971 _____ | 60,000 | 70,726.44 |

The petitioners' payment of $57,500 to Diamond in 1970 was made on December 23, 1970. Of such payment, $50,337.50 represented payment for packing and marketing their 1970 D'Anjou pear crop and $7,162.50 represented payment for packing and marketing their 1970 Bartlett pear crop. The petitioners' payment of $60,000 in 1971 was made on December 30, 1971, and represented payment for packing and marketing their 1971 D'Anjou pear crop.

The petitioners started receiving payments for their pears soon after delivery to the cooperative each year. The payments were made periodically until the particular pool was closed and final payment made. The periodic payments represented the cooperative's estimate of the net profit to be realized from the entire pool, and those payments were the same to all members, irrespective of whether the member had made a payment of the estimated charges for packing and marketing his produce. At or near the time the pool was closed, the cooperative credited the petitioners for the expense payment previously made and the discount for early payment. Such credits were reported as income by the petitioners in the year received. The 1970 D'Anjou pool was closed in July 1971, and the 1970 Bartlett pear pool was closed in October 1972. The 1971 D'Anjou pool was closed in May or July 1972.

On their 1970 and 1971 Federal income tax returns, the petitioners deducted the payments to the cooperative as "packing" expenses. In his notice of deficiency, the Commissioner determined that such payments were not ordinary and necessary business expenses but were "advances."

The Commissioner argues that the payments were not expenses of the petitioners; that such payments were advances or loans; and that the expenses were not incurred in the petitioners' trade or business.

Section 162(a) allows a taxpayer to deduct "ordinary and necessary" expenses incurred in his trade or business. Section 1.162-1(a) of the Income Tax Regulations provides in part:

Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business * * *. Among the items included in business expenses are * * * selling expenses * * *

See *Royal Cotton Mill Co.,* 29 T.C. 761, 784-786 (1958). Under section 461(a), "The amount of any deduction * * * allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Section 1.461-1(a)(1) of the Income Tax Regulations provides in part: "Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid."

In our opinion, the petitioners' payments to Diamond were deductible as an ordinary and necessary expense of their trade or business. They were in the trade or business of farming, and in that business, they produced fruit for sale. They delivered that fruit to Diamond to pack and sell for them, and thereby became liable to pay Diamond for its services. Diamond could collect for its services by subtracting its charges from the amount paid the petitioners as their share of the proceeds from the sale of the fruit. In the alternative, Diamond had the authority under its bylaws to assess and require the petitioners to pay those charges in advance of the receipt of their share of the proceeds. Had Diamond sustained a loss on the pools involving the petitioners, it had the right under the bylaws to assess and collect from the petitioners their proportionate share of that loss. Thus, when Diamond performed its services for the petitioners, they incurred a liability to pay for such services. The payment of that liability is an expense of selling the fruit and therefore is an ordinary and necessary expense of the trade or business of the petitioners. *Royal Cotton Mill Co., supra.*

Since the petitioners reported their income by use of the cash receipts and disbursements method of accounting, they were entitled to deduct the payments to Diamond when made. Ordinarily, a cash method taxpayer can deduct his business expenses when paid. Sec. 1.461-1(a)(1), Income Tax Regs. Here, the petitioners could have delayed making the payments, but the

Commissioner has not taken the position that their practice distorted or failed to reflect clearly their income. In the absence of such a determination by the Commissioner, the existence of that privilege of postponing the payments is no reason to deny a deduction for the year when the payment was actually made. Sec. 1.461-1(a)(3)(i), Income Tax Regs.; see also sec. 1.446-1(a)(2), Income Tax Regs. Substantially all of the services had actually been performed by Diamond before the payments were made, and thus, this is not a situation in which there was an advance payment for services to be rendered in a subsequent year. Compare *Tim W. Lillie,* 45 T.C. 54, 62 (1965), affd. per curiam 370 F. 2d 562 (9th Cir. 1966); cf. *James V. Cole,* 64 T.C. 1091 (1975); *Andrew A. Sandor,* 62 T.C. 469 (1974), on appeal (9th Cir., Sept. 30, 1974). Since the petitioners received "discount" or interest on the payments made by them, there was an incentive, other than tax considerations, for them to make the payments in those years. Compare *Tim W. Lillie, supra;* see Rev. Rul. 75-152, 1975-17 I.R.B. 15. Because of the accounting procedures used by Diamond, the petitioners actually received, in the year following each payment, a final distribution equal to that payment plus interest; yet, the effect would have been substantially the same if Diamond had chosen to take the petitioners' payment into consideration in computing the periodic distributions to them, and had Diamond done so, the petitioners would not then have received a final distribution equal to their payment plus interest. For these reasons, we are satisfied that the petitioners should have used the rules generally applicable to cash method taxpayers, and that they were entitled to deduct the payment when made.

Each of the Commissioner's arguments is based on his misconception of the relationship between the petitioners and the cooperative. The cooperative performed services for the petitioners for which it had the right to be paid. The Commissioner asserts that the only permissible method for paying the cooperative for such services was by deducting its charges from the proceeds of the sale of the petitioners' produce since it was a farmers' cooperative as defined by section 521(b)(1). We disagree.

Section 521(b)(1) provides in pertinent part:

The farmers' cooperatives exempt from taxation to the extent provided in subsection (a) are farmers', fruit growers', or like associations organized and

operated on a cooperative basis (A) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses * * *

Such section does not purport to prohibit a farmers' cooperative from collecting for its services before the produce is sold as long as such charge does not exceed the "necessary marketing expenses," and the Commissioner has furnished no authority to support his contention. Moreover, he has stipulated that Diamond is a "farmers' cooperative" as defined in section 521. Pursuant to its bylaws, Diamond could have assessed and collected a fee for services from all of its members prior to the determination of actual cost. The Commissioner has not even suggested that such provision of the bylaws violates section 521(b)(1); thus, he cannot seriously argue that such section is violated when the petitioners made payments for the cooperative's services. Section 521(b)(1) is intended to insure that a farmers' cooperative returns all earnings to its members; it was not intended to regulate when a cooperative can collect for its services. See sec. 1.521-1(a)(1), Income Tax Regs.

The Commissioner also argues that the expenses incurred for packing and marketing the petitioners' fruit are expenses of the cooperative and not expenses of the petitioners. See *Welch v. Helvering,* 290 U.S. 111 (1933); *Kentucky Utilities Co. v. Glenn,* 394 F. 2d 631 (6th Cir. 1968). However, the petitioners did not attempt to pay the expenses of the cooperative; they merely paid their own contractual liability to Diamond. The Commissioner's argument that as members of the cooperative, the petitioners were not liable for the debts of the cooperative under Oregon law is irrelevant. They were liable under their contract with Diamond to pay it for packing and marketing their fruit. It is this contractual liability that the payments discharged, and such payments are clearly deductible as the petitioners' business expenses.

The Commissioner's next argument is that the petitioners' payments to Diamond were nondeductible advances or loans. He argues that the payments were made under an agreement of reimbursement and are thus nondeductible. See *Adolph B. Canelo III,* 53 T.C. 217 (1969), affd. per curiam 447 F. 2d 484 (9th Cir. 1971). However, in this case, there is no evidence of any agreement to reimburse the petitioners for the payments to Diamond.

The Commissioner alleges that since the petitioners were repaid an amount equal to their "prepayment" in subsequent years, it is clear that they were reimbursed for their "prepayment." Such argument ignores the terms of the petitioners' agreement with Diamond. Diamond made periodic payments to members of each pool as the produce was sold. It reduced such payments by its estimated expenses so that each member received only the net proceeds from their produce. Since the petitioners had already paid most of their share of the expenses of selling their produce, they received a final distribution near the close of the pool to equalize their share with the other members who had not made the early payment. They were not "reimbursed" for their prior payment; but rather, they were merely given credit for the fact that they had already paid most of their share of the cost to the cooperative.

The Commissioner also argues that the prepayments were in the nature of loans since the petitioners received a "discount" for the early payments. However, the evidence makes it clear that such payments were not loans but were merely early payments for services rendered. The fact that Diamond encouraged such payments by offering a discount does not transform the transaction into a loan.

The Commissioner's final contention is that the payments to Diamond were not deductible because the petitioners were not in the trade or business of processing and marketing fruit. We cannot consider this to be a serious argument. Obviously, the petitioners were not in the trade or business of processing and marketing their own fruit. However, that does not mean that when they pay another party to do so for them the expenses are not incurred in their trade or business. The expenses were directly connected with their trade or business of fruit farming. See sec. 1.162-1(a), Income Tax Regs.

To reflect concessions on other issues,

*Decision will be entered under Rule 155.*