JOHN N. BAIRD AND JOY BAIRD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7429–74.   Filed April 27, 1977.

*F. Alan Fletcher* and *William L. Crawford,* for the petitioners.

*James L. Norris,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1970 in the amount of $26,042. By amended answer respondent increased the deter-

---

mined deficiency by disallowing additional interest and depreciation expenses claimed on petitioners' return.[1]

The issues for decision herein are: (1) On what date did petitioner John N. Baird become the owner of a certain building and personal property located therein, for tax purposes;[2] and (2) what amount, if any, may petitioners claim as deductible interest expense under section 163, I.R.C. 1954,[3] with respect to payments made for loan commitment fees, loan transfer fees, and mortgage points.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Those exhibits attached to the stipulation which were found relevant and admissible are incorporated herein by this reference.

At the time of filing the petition herein, petitioners were residents of Honolulu, Hawaii. Petitioners, cash basis tax-payers, filed their joint Federal income tax return for the taxable year 1970 with the Director of the Western Region, Internal Revenue Service Center, Ogden, Utah. Joy Baird is a party solely by reason of having joined in said return and petitioner hereafter will refer only to John N. Baird.

On March 1, 1969, Midgley Manor, Inc. (Midgley), a Utah corporation, as borrower, entered into a building loan agreement with Johnson-Anderson Mortgage Co. (Johnson-Anderson), as lender, whereby Midgley was to receive a federally insured (by FHA) construction loan for the expansion of the Midgley Manor Convalescent Home located in Murray, Utah. In general the building and loan agreement provided for a loan in the principal amount of $637,300, to be advanced at various stages of completion, with interest payable from the date of each advance at 7½ percent per annum, and specifically required completion of the construc-

---

[1] The total amount of the deficiency determined by respondent after making the additional adjustments in his amended answer was not computed. The amount of the deficiency, if any, may be determined in accordance with our findings herein under Rule 155.

[2] The resolution of this question is necessary to determine the proper amount of the deduction for depreciation under sec. 167(a) and additionally is relevant to the determination of issue 2 above.

[3] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

tion by March 30, 1970. Pursuant to the terms of said building loan agreement, on April 4, 1969, Midgley executed a mortgage note for the sum of $637,300 bearing interest at 7½ percent per annum and payable ratably over a period of 20 years; to secure payment of said note Midgley executed a mortgage that same date encumbering the construction property.

Also on April 4, 1969, Midgley entered into a regulatory agreement with the Federal Housing Administration (FHA) whereby FHA agreed to insure the aforedescribed 20-year note made by Midgley. Under the terms of this regulatory agreement, among other requirements, Midgley was required to establish and maintain a "reserve for replacements" to be held in a separate account by the mortgagee and was to obtain written permission from the Commissioner prior to conveyance of the mortgaged property. Violation of any of the terms of the regulatory agreement could result in default under the mortgage and note and make the entire indebtedness become immediately due and owing.

At the time the building loan was made Johnson-Anderson had obtained a commitment for the permanent financing for the project from Bowery Savings Bank of New York. However, due to construction delays the project was not completed within the requisite time and Bowery Savings allowed its commitment to expire. In spring of 1970, in an attempt to obtain a new lender for the permanent financing of the project, Midgley contacted Commercial Security Bank of Salt Lake City, Utah (Commercial). As a business practice Commercial did not make long-term loans to hold in its own portfolio but it would act as an interim (construction) lender, provided it could secure a commitment from an investor to provide the permanent financing at the completion of construction.

On June 12, 1970, Commercial received a commitment from the Utah State Retirement Board (USRB) to provide the permanent financing of the Midgley project at the completion of construction thereof. The commitment contemplated the acquisition from Commercial of the note and mortgage made by Midgley, by endorsement and assignment, respectively. Due to the disparity between the stated interest rate on the Midgley note (7½ percent) and the then-prevailing market

interest rate for this type of loan, USRB's commitment required a prepayment of 12 percent (points), at the time of closing, i.e., USRB was to receive 12 percent of the face amount of the loan (12 percent of $637,300 or $76,476), payable at the time of closing. Additionally, USRB required a "commitment fee" of 1 percent of the face amount of the loan, payable upon acceptance of the offer of commitment.

In order to effectuate the above transaction and thus provide permanent financing for the Midgley project it was necessary for Commercial to acquire the outstanding construction loan· from Johnson-Anderson. As a condition to undertaking this transaction, Commercial required that funds for the payment of the 1-percent commitment fee and the 12-percent mortgage fee to USRB be deposited by the borrower at the time it acquired the loan documents from and paid the outstanding loan balance to Johnson-Anderson. Commercial also required payment of 1 percent of the face amount of the loan as a "transfer fee" for its participation in this transaction.

At this time, summer 1970, Johnson-Anderson held a total of $33,855.11 of Midgley's funds in escrow, representing deposits and reserves required by FHA under its regulatory agreement with Midgley.[4] However, the total amount of cash that Commercial required be deposited with it to cover the transfer and commitment fees and the mortgage points prior to proceeding with the transaction as outlined above was $89,222. Midgley was not in a position to furnish the additional funds (approximately $54,400). For some previous indefinite period of time, Midgley had been actively investigating various alternative sources of funds for the construction project as well as for the corporation in general. To that end Noel Taylor of Roberts & Taylor, Inc., stockbrokers and general financial consultants, was contacted in late spring of 1970. Taylor proposed that Midgley offer the convalescent home project for sale to be followed by an immediate leaseback of the building and equipment by Midgley. Benjamin G. Midgley, Jr., president, chief operating officer, and majority shareholder (50.5 percent of the stock

---

[4] Apparently these reserves were no longer required by FHA after construction had been completed and the FHA regulatory agreement complied with.

outstanding) of Midgley, authorized Roberts & Taylor, Inc., to find a buyer for the project. Roberts & Taylor, Inc., then circulated a written proposal to a number of potential investors. The offer was captioned as a tax-shelter investment and described the proposed sale-leaseback arrangement, i.e., sales price of $1,250,000, downpayment of $350,000 including $100,000 prepaid interest and a $100,000 covenant not to compete, and annual lease payments of $130,000. Based upon this solicitation petitioner met with Ben Midgley and Gaylen S. Young, Jr., who was secretary and a shareholder (8 percent of outstanding stock) of Midgley as well as its general counsel, on August 29, 1970, the Saturday preceding the Monday on which the financing commitment of USRB was scheduled to expire. At this meeting the parties reached an agreement for the sale and leaseback of the Midgley project. The agreement, entitled "Preliminary Agreement," provided as follows:

This Agreement entered into this 29th day of August, 1970, by and between MIDGLEY MANOR, INC., a Utah Corporation, hereinafter referred to as SELLER, and JOHN BAIRD, hereinafter referred to as BUYER, of Honolulu, Hawaii.

### WITNESSETH:

In consideration of the mutual promises of the parties, and as hereafter set out, the undersigned parties hereby agree as follows:

1. BUYER agrees to buy the building, land, and improvements (furniture and furnishings) located at 404 East 5600 South, Murray, Utah, and the SELLER agrees to sell said properties, with the understanding of a lease-back agreement as hereafter referred to.

2. The purchase price of the building and land without the furniture and furnishings, shall be $950,000.00, and the purchase price of the furniture, furnishings, and equipment shall be $350,000.00.

3. BUYER shall pay the sum of $57,000.00 at this time, as prepaid interest, which sum is acknowledged as being paid with the execution of this Agreement. It is further agreed that said $57,000.00 shall be paid back to BUYER, by SELLER, within 60 days from the date hereof, without interest, should the parties hereto be unable to consumate [sic] the final Agreement.

4. It is understood that a further cash amount of $293,000.00 will be paid by BUYER within 30 days from the date hereof, and further that BUYER will assume SELLERS F.H.A. mortgage loan in the sum of $637,300.00. BUYER further agrees to pay SELLER an additional $312,700.00 over the same period of time that the F.H.A. Mortgage is paid, with 10% interest, and BUYER further agrees to give a second mortgage to SELLER to secure same.

5. SELLER agrees to lease back the building, land and improvements (without furniture, furnishings and equipment) for $96,000.00 per year, payable at $8,000.00 per month for 20 years. In addition thereto, SELLER agrees to lease back the furniture, furnishings and equipment for the sum of $66,000.00 per year, payable at $5,500.00 per month for 10 years.

6. BUYER agrees to sell back the building, land and equipment at terms to be specified later.

7. SELLER reserves the right to expand the present facilities upon the land involved herein.

Notwithstanding the recitation contained in paragraph 3 of the preliminary agreement, no actual monetary consideration changed hands at the execution of said agreement. However, a few days later petitioner did pay the $57,000 referred to in the agreement as prepaid interest, by issuing a check made by J. Baird Investment Co. payable to Commercial.

Having assurance that the funds were now available which were needed to pay its transfer fee and USRB's commitment fee and the mortgage points, Commercial accepted USRB's commitment and acquired the outstanding building loan from Johnson-Anderson. Commercial acquired the note and mortgage made by Midgley by assignment from Johnson-Anderson on September 8, 1970, and also received the escrow deposits held by Johnson-Anderson.

On September 14, 1970, the shareholders and board of directors of Midgley voted to confirm and ratify the preliminary agreement between petitioner and Midgley. Thereafter, pursuant to the building loan and FHA regulatory agreement, Commercial made various advances to Midgley as construction on the concerned project continued toward completion. Additionally, attorneys for petitioner and Midgley worked to complete the final agreement for sale and leaseback of the building and real property and the equipment and personalty of the convalescent home. On October 28, 1970, 60 days after execution of the preliminary agreement, all of the documents evidencing the sale and leaseback were completed and executed. These included the following:

(a) An agreement between petitioner and Midgley dated August 29, 1970, for the purchase and sale of the real property and building thereon with a purchase price of $950,000 payable by the assumption of the mortgage loan held by Commercial and by the execution of unsecured promissory

notes in the aggregate amount of $312,700 dated October 15, 1970, and payable to Midgley over a period of 20 years;

(b) A bill of sale from Midgley to petitioner dated August 29, 1970, conveying the personal property located in the convalescent home as well as the property ordered but undelivered, for a purchase price of $293,000;

(c) A lease of the land and building from petitioner to Midgley as lessee, dated August 29, 1970, and effective through October 1, 1990, with annual rent of $96,000 payable monthly in installments of $8,000 commencing October 1, 1970;

(d) An equipment lease from petitioner to Midgley as lessee, dated August 29, 1970, effective through October 1, 1980, with annual rent of $66,000 payable in monthly installments of $5,500; and

(e) A warranty deed dated August 29, 1970, conveying the concerned real property from Midgley to petitioner.[5]

After construction of the project was substantially completed, on November 13, 1970, a final closing of the building loan transaction was held with FHA, Commercial, and Midgley. At this meeting FHA finally insured the full amount of the $637,300 loan and authorized the final disbursement by Commercial of the full loan amount.

On November 25, 1970, petitioner signed the original mortgage note and mortgage agreement (held by Commercial) as comaker.

On November 30, 1970, the placement of the permanent financing of the project was completed; Commercial endorsed the mortgage note and assigned the mortgage to USRB. As part of this transaction, Commercial transferred $76,476 to USRB in payment of the aforedescribed mortgage points. The $76,476 paid by Commercial represented funds it had received from petitioner and from the Midgley escrow accounts previously held by Johnson-Anderson.

During 1970 petitioner received and reported as income rental payments from Midgley in the aggregate amount of $40,500, representing rent for the months of September, October, November, and December 1970, for the land,

---

[5] This deed was not placed on record with the recorder, Salt Lake County, Utah, until Nov. 17, 1970.

building, and equipment as provided in the agreement of the parties dated August 29, 1970.

Petitioner began making the mortgage payments due with respect to the Midgley property commencing with the month of October and paid the real estate taxes attributable to said property for the entire year 1970.

On his income tax return for 1970 petitioner claimed deductible expenditures attributable to the Midgley project in the aggregate amount of $118,066, which included $6,373 for the transfer fee paid to Commercial and $6,373 for the commitment fee and $76,476 for the mortgage points paid to USRB. In addition petitioner claimed deductions for 4 months' depreciation on the building and equipment leased to Midgley in the amount of $10,769 and $19,533, respectively.[6]

In his statutory notice respondent disallowed the claimed deductions for the aforementioned commitment fee, transfer fee, and mortgage points, an aggregate of $89,222, for the stated reasons that the deduction thereof resulted in a material distortion of income and also that petitioner had not established that all of said items constituted interest paid in 1970. In lieu of the disallowed deduction, respondent determined that the expenditures should be amortized over the 20-year life of the loan and accordingly allowed a deduction for amortization in the amount of $1,487.

In an amendment to his answer, respondent disallowed the $1,487 deduction for amortization for the stated reason that petitioner did not pay $89,222 for "loan expenditures" and at the time he did pay $57,000 of said expenditures, he was not the legal owner nor did he have the benefits and burdens of ownership of the Midgley Manor property. Respondent determined that petitioner became the owner of the Midgley Manor property on November 17, 1970, and thus also disallowed the claimed depreciation deductions for 1970 with respect to the building and equipment except for the month of December; respondent increased petitioner's depreciable basis

[6] On the depreciation schedule attached to petitioner's return $861,544 was used as the depreciable basis of the building; the amount of the salvage value used in this determination was not disclosed and accordingly the cost claimed attributable to the building by petitioner is uncertain. The depreciable basis used by petitioner for the equipment was $293,000.

in the building in the amount of $57,000 representing the aforedescribed alleged interest expense paid by petitioner.

OPINION

The first question we must decide is when petitioner acquired an interest in the Midgley Manor property.[7] This will determine when petitioner became entitled to deductions for depreciation of the depreciable property and will have a bearing on whether petitioner may deduct as interest in the year 1970 certain mortgage fees and "points." Petitioner could not deduct depreciation until he acquired an economic interest in the property that would decrease through depreciation, *Weiss v. Wiener*, 279 U.S. 333 (1928); Rev. Rul. 69–89, 1969–1 C.B. 59; and in order for interest with respect to the mortgage on the real estate to be deductible, petitioner must have been the legal or equitable owner of the property. Sec. 1.163–1(b), Income Tax Regs.; *Dean v. Commissioner*, 35 T.C. 1083 (1961).

On August 29, 1970, petitioner entered into an agreement with the president and secretary of Midgley, acting on its behalf, for the purchase and sale of the Midgley property and the leaseback thereof by Midgley, the seller. The agreement was captioned "preliminary agreement." The terms of the agreement specified a purchase price for the land and building of $950,000 and for the furniture, furnishings, and equipment of $350,000, and the agreement specified the general manner by which the above consideration was to be paid. The parties also specified in the agreement that Midgley would lease back the realty for 20 years with annual rental of $96,000 and would lease back the equipment for 10 years with annual rental of $66,000. Under paragraph 3 of the agreement petitioner was to pay currently $57,000 "as prepaid interest." However, the paragraph went on to provide that the seller would pay back to petitioner the $57,000, without interest, within 60 days should the parties be unable to

---

[7] For purposes of determining the time of conveyance, the parties draw no distinction between the real and personal property but focus upon the time of conveyance of the real property. It is clear that both the realty and personalty were sought to be purchased and sold in a combined transaction, and in accordance with the parties' presentations we will look to the date of acquisition of the realty as the date determinative for this case.

consummate the final agreement. Petitioner paid the $57,000 to the mortgagee on September 2, 1970, but the agreement was not finalized until October 28, 1970, when the deed to the real estate and other papers, all backdated to August 29, 1970, were executed.

Petitioner contends that the parties intended the preliminary agreement to be binding on both sides and that as of the date of this agreement he became the equitable owner of the Midgley property.

Respondent first raised the issue of when petitioner became the owner of the property by way of amended answer and thus bears the burden of proof thereon. Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent contends that the preliminary agreement was just that—a contract for sale in the future, and that petitioner did not become the equitable or legal owner until the deed conveying the real property from Midgley to petitioner was recorded on November 17, 1970.

The question of when a sale is complete for tax purposes is essentially one of fact which must be resolved by an examination of all of the facts and circumstances, no single one of which is controlling. The test is one of practicality. *Clodfelter v. Commissioner*, 426 F.2d 1391 (9th Cir. 1970), affg. 48 T.C. 694 (1967); *Commissioner v. Segall*, 114 F.2d 706 (6th Cir. 1940), revg. 38 B.T.A. 43 (1938); *Deyoe v. Commissioner*, 66 T.C. 904 (1976). In examining the circumstances surrounding a conveyance of property to determine when it has occurred, the focus is directed to a consideration of when the "benefits and burdens" of ownership have shifted. *Merrill v. Commissioner*, 40 T.C. 66 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). And for purposes of real property, a sale is generally considered to have occurred at the earlier of the transfer of legal title or the practical assumption of the benefits and burdens. *Dettmers v. Commissioner*, 430 F.2d 1019 (6th Cir. 1970), affg. 51 T.C. 290 (1968); *Deyoe v. Commissioner, supra*. In this case legal title was conveyed to petitioner by deed executed October 28, 1970, dated August 29, 1970; the deed was put on record November 17, 1970. Consequently, our inquiry is directed to whether petitioner

acquired the benefits and burdens of ownership of the Midgley property in practical reality, prior to October 28, 1970.[8]

At the time of the preliminary agreement Midgley was in a precarious financial position; it had started the expansion project with construction financing by Johnson-Anderson and a commitment for permanent financing of an FHA-insured loan from Bowery Savings Bank. But when the project was not completed within the prescribed time, Bowery allowed its commitment to expire. Thus Midgley had already lost a favorable commitment for long-term financing of the project and had an opportunity to secure an alternative arrangement for permanent financing with USRB through Commercial, which also agreed to take over the construction loan. However, the new terms were more expensive. Commercial required a 1-point transfer fee and USRB a 1-point commitment fee and the payment of a 12-point mortgage fee. And before undertaking to perform its part in the transaction, Commercial required receipt of all of these fees, a total of $89,222. The deadline for acceptance of the USRB commitment was August 31, 1970. Midgley lacked the necessary funds to close the financial arrangement. Of course, at all times relevant herein, the regulatory agreement between Midgley and the FHA, under which terms all of the project's financing was insured, was of crucial importance. In this regard, the parties faced a dilemma because a conveyance of the Midgley property without the prior written consent of FHA was technically a breach of the regulatory agreement, and approval of the sale to petitioner by the FHA, if possible,[9] would be time consuming and obviously would not be forthcoming in time to meet the USRB commitment deadline.

In this context, on the weekend before the USRB commitment expired, the parties met and negotiated the preliminary agreement for the sale and leaseback of the Midgley property, and petitioner made available the front-end funds necessary

---

[8] Respondent is clearly wrong in his assertion that legal title did not pass until the deed was recorded. The deed was valid and binding between the parties as of Oct. 28, 1970, see Utah Code Ann. sec. 57–1–6 (1953), although third parties would not be put on notice thereof until it was recorded.

[9] A representative of FHA testified that it was not the accepted practice of the agency to insure loans made by individuals in connection with projects such as the Midgley construction.

to secure the financing of the project. The $57,000 paid by petitioner was returnable to petitioner, without interest, if the final agreement could not be consummated within 60 days. The documents were completed and executed on October 28, 1970, the 60th day subsequent to the date of the preliminary agreement, and petitioner's $57,000 was used as contemplated in the preliminary agreement.

Viewing the record as a whole, we believe the parties intended that the benefits and burdens of ownership were to be shifted to petitioner as of the date of the preliminary agreement, conditional only on consummation of the financing arrangements within 60 days. While legal ownership of the Midgley real estate may not have passed to petitioner until the deed was executed on October 28, 1970, petitioner assumed the benefits and burdens of ownership and became the equitable owner of the Midgley property as of August 29, 1970. *Pacific Coast Music Jobbers, Inc. v. Commissioner,* 55 T.C. 866 (1971), affd. 457 F.2d 1165 (5th Cir. 1972); *Martin v. Commissioner,* 44 T.C. 731 (1965), modified per curiam 379 F.2d 282 (6th Cir. 1967). See also *Bunnell v. Bills,* 13 Utah 2d 83, 368 P.2d 597 (1962).

The terminology used in the preliminary agreement itself is rather definitive. The buyer agreed to buy and the seller agreed to sell with no specific conditions attached. The price was fixed. The buyer was required to pay $57,000 with execution of the agreement, and he did so within a few days. The buyer was also required to pay additional cash in the amount of $293,000 within 30 days and agreed to assume the seller's FHA mortgage in the amount of $637,300. The seller agreed to lease the property back for a specified period at a specified rent and the buyer agreed to sell back the property at terms to be specified later. There were no conditions attached to any of the undertakings specified. The only provision which casts any doubt on the meaning of the agreement was the provision that the $57,000 should be paid back to the buyer by the seller within 60 days should the parties be unable to consummate the final agreement. Under the circumstances we do not believe this latter provision prevented the agreement from becoming binding on the parties at the time it was executed or that the parties intended it to do so.

The preliminary agreement was apparently reached and the document executed on Saturday, August 29, 1970, just 2 days before the USRB permanent financing commitment was scheduled to expire. It is understandable that all the details and the formal documents would require some time for preparation. Nevertheless, petitioner was required to put up $57,000 immediately. The only provision for its return to him was if the financing arrangements upon which the transaction was predicated could not be worked out. Since the $57,000 was all that was needed to close the financing transaction, there was no likelihood that the transaction would not be consummated when petitioner's $57,000 was forthcoming. The fact that the agreement required the approval of Midgley Manor's stockholders and board of directors was of little moment. Midgley's president and secretary who were directors and owned more than 50 percent of the stock of the corporation were participants in the negotiations and were signatories to the agreement in behalf of Midgley Manor. See *Grover v. Garn,* 23 Utah 2d 441, 464 P.2d 598 (1970). Furthermore, construction on the project had been in progress for some time and the agreement with petitioner was the last-minute means of obtaining the financing to complete it; it is not likely that the stockholders and directors of Midgley would renege on the agreement.

Respondent's argument that petitioner's payment of $57,000 was only a loan to Midgley lacks foundation under the terms of the agreement and in reality. The agreement itself characterized it as prepaid interest, and there was no doubt with respect to its intended use; it was to be used to meet Commercial's requirement that the fees and points be paid at the time it took over the construction loan. While petitioner may have been able to recover the $57,000 from Midgley had the agreement been aborted, it is doubtful that petitioner could have recovered it from Commercial. Furthermore, we believe it is highly unlikely that petitioner would have loaned Midgley $57,000 for 60 days at no interest and with no security.

The entire transaction was consummated within the time specified in the preliminary agreement and on the terms specified in the agreement. As long as those terms and conditions were met petitioner could not have prevented

consummation. The fact that the formal documents were all backdated to August 29, 1970, also supports the conclusion that the parties intended the transaction to be closed as of that date. See *Deyoe v. Commissioner, supra*. No reason has been advanced for backdating the instruments except to comply with the intentions of the parties. In addition petitioner made the mortgage payment that was due in October and paid the property taxes on the Midgley property for the whole year and also Midgley started paying rent on the property to petitioner for the month of September 1970. Thus the parties intended the accoutrements of ownership to pass to petitioner at the time of the preliminary agreement. *Pacific Coast Music Jobbers, Inc. v. Commissioner, supra; Merrill v. Commissioner, supra.*

We conclude that respondent has failed to carry his burden of proving that petitioner did not acquire equitable ownership of the Midgley property prior to October 28, 1970, and we find that petitioner did become the equitable owner of the property on August 29, 1970.[10]

In light of our conclusion above there is little substance to respondent's argument that petitioner did not pay the commitment and transfer fees and the points. As we view the transaction petitioner bought the Midgley property and all of Midgley's interests and obligations under the financing arrangements that had been made with respect to the property. Petitioner effectively stepped into the shoes of Midgley with relation to the property when the parties entered into the agreement. The $57,000 paid by petitioner, together with the deposits totaling $32,222 paid to the construction lender by Midgley, became the property of petitioner held by Commercial as his agent until they were applied to the obligations petitioner assumed under the mortgage and financing arrangements. When Commercial applied $6,373 of this amount to its own transfer fee and $6,373 of it to USRB's commitment fee in September, and $76,476 of it to pay the "points" required by USRB on November 18, 1970, the payments were made on behalf of

---

[10] As a result, petitioner is entitled to deduct depreciation with respect to the building and the personal property located therein beginning in the month of September, or when the property was actually placed in service.

petitioner and petitioner must be considered as having made the payments. Certainly Commercial did not make the payments in its own behalf; it had no obligation to do so. And even if we were to accept respondent's argument that petitioner did not acquire the Midgley property until October 28, 1970, at the time the "points" were paid to USRB Midgley had no reason to pay the points because petitioner was the only one obligated to do so.

The same reasoning applies with respect to respondent's argument that when petitioner paid the $57,000 he did not own the property and therefore is not entitled to a deduction for interest paid on a mortgage of the property. Even if petitioner did not own the property when he paid the $57,000, it was understood the $57,000 was to be held by Commercial until it was applied to the fees and points, and when it was applied to the points petitioner was without question the owner of the property.[11]

This brings us to the question of whether the transfer fee, the commitment fee, and the points were in fact interest, deductible as such in 1970 when paid. There can be little question from the evidence that the 12 points required by USRB was an additional charge for the use of money, hence, interest. The evidence all indicates that the going rate of interest on mortgage loans at the time USRB was contacted was considerably in excess of the 7½-percent interest provided in the FHA-insured permanent mortgage and that USRB would not have provided the money for the takeout loan unless the points were paid. We do not know just how the additional interest that would have been demanded was converted into points, but it does not seem likely that 12 points paid at the front end of a 20-year loan would add much more than 1 or 2 percent additional annual interest over the

---

[11] Because of the pressure of time all of the details required to consummate the transaction were probably not thought through and were not set forth when the preliminary agreement was executed. And, perhaps, to some extent because respondent raised the issue of ownership shortly before the trial, the details of just what did take place between the time the preliminary agreement was executed and the permanent loan was closed are somewhat obscure. However, respondent had the burden of proof on this issue and we have recited in our findings and opinion the facts as we can determine them from the evidence presented, recognizing that there are some contradictions to be found.

life of the loan, which would bring the combined interest rate well within the going interest rate at the time.

We would have more trouble in characterizing the transfer fee and the commitment fees as interest, because there may have been an element of service provided for these fees, but we are spared the necessity of so characterizing them for purposes of this case. In his opening brief petitioner stated that respondent had agreed that for purposes of this case the fees would be considered to be interest. Respondent did not deny this statement in his reply brief, nor did he argue that the fees should be characterized differently from the points. This, together with respondent's position stated in Rev. Rul. 69–188, 1969–1 C.B. 54, and the position taken by respondent as related in this Court's opinion in *Lewis v. Commissioner,* 65 T.C. 625 (1975), leads us to conclude that respondent agrees that the fees and points should be considered the same for purposes of this case.

Section 163(a) provides:

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

Petitioner, a cash basis taxpayer, in accordance with section 163(a), seeks to deduct in toto the $89,222 paid as interest in 1970.

Respondent argues, consistent with his stated reason in the notice of deficiency, that even though petitioner's payment of the points and fees qualified as interest deductible under section 163, nevertheless, to allow said deduction would materially distort petitioner's income of $123,449 reported for 1970 and thus should be denied under authority of section 446(b).[12]

It is now established that section 163 must be read in light of sections 461[13] and 446(b). A cash basis taxpayer may deduct

---

[12] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

[13] SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) GENERAL RULE.—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

interest in the year paid unless such deduction would result in a material distortion of income. *Sandor v. Commissioner,* 62 T.C. 469 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976); *Burck v. Commissioner,* 63 T.C. 556 (1975), affd. 533 F.2d 768 (2nd Cir. 1976); *Cole v. Commissioner,* 64 T.C. 1091 (1975), on appeal (9th Cir., Jan. 17, 1977); *Resnik v. Commissioner,* 66 T.C. 74 (1976), on appeal (7th Cir., June 30, 1976). The Commissioner has broad discretion in determining whether the method of accounting used by the taxpayer clearly reflects his income. *Commissioner v. Hansen,* 360 U.S. 446 (1959); *Fort Howard Paper Co. v. Commissioner,* 49 T.C. 275 (1967). For this purpose "the term 'method of accounting' includes not only the over-all method of accounting used by the taxpayer, but also the accounting treatment of any item." Sec. 1.446–1(a), Income Tax Regs.; *Sandor v. Commissioner, supra; Burck v. Commissioner, supra; Cole v. Commissioner, supra; Resnik v. Commissioner, supra.* Courts will not overturn the Commissioner's determination unless there is clear evidence that he abused his discretion. *Schram v. United States,* 118 F.2d 541 (6th Cir. 1941); *Drazen v. Commissioner,* 34 T.C. 1070 (1960). The taxpayer has a heavy burden of proof in establishing that the Commissioner abused his discretion. *Fort Howard Paper Co. v. Commissioner, supra; Photo-Sonics, Inc. v. Commissioner,* 42 T.C. 926 (1964), affd. 357 F.2d 656 (9th Cir. 1966). Even if the accounting method used by the taxpayer is in accord with generally accepted accounting principles, it may not clearly reflect income and consequently may not be binding upon the Commissioner. *American Automobile Assn. v. United States,* 367 U.S. 687 (1961); *Ft. Howard Paper Co. v. Commissioner, supra; Sandor v. Commissioner, supra.*

Petitioner contends that respondent abused his discretion in the situation at bar and that he should be entitled to deduct the mortgage points and fees paid by him in 1970. We disagree with petitioner with respect to the mortgage points.

Unlike the fees, which we will discuss later, the 12 points ($76,476) petitioner was required to pay USRB was compensation, in addition to the 7½-percent interest called for in the FHA loan agreement, for the use of the money borrowed over the entire life of the loan. It was not refundable. It was prepaid interest on the face amount of the loan. As such, it was not deductible in the year paid even by a cash basis

taxpayer if the respondent, with reason, determined that to allow the deduction in 1970 would materially distort petitioner's income. *Sandor v. Commissioner, supra.* Respondent made such a determination in this case. Cf. *Rubnitz v. Commissioner,* 67 T.C. 621 (1977). The facts support respondent's determination.

On their income tax return for 1970, petitioners reported adjusted gross income in the amount of $123,449. Included in the computation of this amount was a net loss of $58,800 from rents and royalties, which consisted of a gain on the other rental properties and a loss of $77,566 on Midgley Manor. The rental income reported from Midgley Manor was $40,500; the expenses totaled $118,066. Of those expenses $17,702 represented regular interest on the loan, $6,373 was for the commitment fee, $6,373 was for the transfer fee, and $76,476 represented the mortgage points. Thus, the mortgage points alone were almost double the rental income. Furthermore, the mortgage points together with the regular interest paid totaled $94,178 of interest paid for the use of $637,300 for only a short part of the year 1970. Beyond any question the payment of the mortgage points had significant impact on petitioners' taxable income for 1970 and we conclude that petitioners have failed to show that respondent abused his discretion in determining that allowance of the entire $76,476 as a deduction for 1970 would materially distort petitioners' income for 1970.[14]

Petitioner relies upon Rev. Rul. 69–582, 1969–2 C.B. 29, for the proposition that "points" paid by a cash basis taxpayer are deductible in the year paid. However, respondent argues, and we agree, that petitioner's reliance is misplaced. In that ruling respondent, while recognizing that a "loan processing fee" or "points" might constitute interest, see Rev. Rul. 69–188, *supra,* merely concluded that under the facts recited therein the deduction of a $1,200 loan-processing fee (points) in the year paid did not result in a material distortion of the taxpayer's income.[15]

---

[14] The loan was made on Nov. 30, 1970. Consequently, of the total amount of interest represented by the points, 1/240, or approximately $319, constitutes deductible interest for 1970.

[15] We do note however that there is some justification for petitioners' overly broad interpretation of respondent's ruling. The facts recited therein do not include a

Petitioner also contends that this case is distinguished from our earlier cases of *Sandor, Burck,* and *Cole,* in that in those cases the taxpayers voluntarily structured the transactions therein to permit a prepayment of interest and that it was clear that the taxpayers made the payments or entered into the transactions primarily to obtain the tax benefits resulting from the interest deduction. Petitioner argues that his investment was not made with a tax-avoidance motive but was a situation where the seller, Midgley, was in a position of distress, and he felt it was an unusually good business opportunity. While we are not altogether convinced that the tax deduction was not a substantial motive in petitioner's decision to enter into the transaction,[16] we are constrained to uphold respondent's determination whether or not petitioner purposely sought tax relief in the form of a prepaid interest deduction. The existence of a tax motive is but a factor to be considered in determining whether the payment was actually interest, and whether there was an impermissible distortion of income. See *Rubnitz v. Commissioner, supra.* The issue is whether allowance of the deduction would clearly reflect income; "the test of clear reflection of income is intended to be an objective one," *Cole v. Commissioner, supra* at 1105. We have concluded that under the present facts the mortgage points were prepaid interest and that the respondent did not abuse his discretion in determining that a deduction of the entire amount paid as "points" in 1970 would not clearly reflect petitioner's income. See also *Resnik v. Commissioner, supra.* Our holding in *Lewis v. Commissioner, supra,* relied on by petitioner, does not persuade us we should rule otherwise. In *Lewis* we were presented with a factual situation we found to be customary and under the particular circumstances presented we found no material distortion of income.

---

statement of the amount of the taxpayer's income nor does the ruling contain any rationale for the conclusion enunciated. See Gabinet, "The Interest Deduction: Several New Installments in a Continuing Saga," 21 Case W. Res. L. Rev. 466, 476 (1970); Bedell, "The Interest Deduction: Its Current Status," 32d NYU Ann. Inst. on Fed. Taxation 1117, 1119–1120 (1974).

[16] Petitioners' adjusted gross income for 1970 ($123,449) was considerably higher than he had reported in prior years. (For 1966 it was $36,492; for 1967 it was $67,747; for 1968 it was $53,729; and for 1969 it was $83,957.) For 1970 petitioner reported capital gains in the amount of $20,024 and one item of miscellaneous income of $50,000.

We reach a different conclusion, however, with respect to the deduction of the transfer fee paid to Commercial and the commitment fee paid to USRB, each in the amount of $6,373, or 1 point. Both were paid by petitioner in 1970 with funds not obtained from the lenders and the parties agree that these fees meet the judicial description of interest, i.e., compensation paid for the use or forbearance of money. See *Old Colony R. Co. v. Commissioner*, 284 U.S. 552 (1932); *Deputy v. duPont*, 308 U.S. 488 (1940). Loan commitment fees such as the two here involved, by whatever name they have been called, have been allowed as deductions as interest in the year they were paid by cash basis taxpayers as long as they were compensation for the use or forbearance of money, see Rev. Rul. 69–188, *supra*, and do not materially distort income, see Rev. Rul. 69–582, *supra*. The parties agree that for purposes of this case the two fees here involved shall be considered to be interest.[17] Since we find that such interest was paid for short periods of time, all of which began and ended in 1970, that the payment of such fees was customary in similar transactions, and that the amounts were not inordinate such as to distort petitioners' income for 1970, we conclude that these fees are deductible by petitioner in 1970.

The transfer fee paid to Commercial was paid to compensate Commercial for supplying the funds to take over the construction loan from Johnson-Anderson for the relatively short time that it would take to complete construction of the project. Commercial acquired the note and mortgage made by Midgley by assignment from Johnson-Anderson on September 8, 1970, and assigned the note and mortgage to USRB on November 30, 1970. Since the interest rate on the note and mortgage was lower than the then-prevailing market rate for this type of loan and, in light of the past history of this project, there was additional risk involved, Commercial demanded and received a fee of 1 point to further compensate it for the use of its money during this period.

---

[17] In his opening statement counsel for petitioners stated that if the fees were not deductible as interest they would be deductible as ordinary and necessary business expenses. However, neither party addressed this claim on brief and hence we have approached the issue on the basis that the fees were to be considered as interest for purposes of this case.

The commitment fee of 1 point required by USRB was to compensate it for holding its money available for the takeout or permanent loan during the period from June 12, 1970, when it made its commitment to Commercial, and either August 31, 1970, when the commitment was accepted or November 30, 1970, when it paid the construction loan to Commercial and took over the permanent financing. Prior to taking assignment of the note and mortgage from Commercial on November 30, 1970, USRB had committed its funds but was receiving no interest. It was customary in the trade to charge a fee for this commitment and the amount charged was not out of line.

Neither of these fees was paid for use of money or for services rendered beyond the year 1970. Having obtained the takeout commitment from USRB, Commercial would be out of the picture by November 30, 1970, and its fee was not refundable. With respect to USRB when its commitment was accepted on August 31, 1970, it was obligated to have funds available to buy the note and mortgage from Commercial on November 30, 1970, and the fee it charged for so obligating itself was not refundable once the commitment was accepted. Since the evidence indicates that lending institutions dealing with their customers at arm's length often or usually require payment of such fees for granting loans, we conclude that the payment of such fees did not result in a distortion of petitioners' income for 1970. And since petitioner was a cash basis taxpayer and these payments did not distort his income, we find that respondent abused his discretion in not allowing a deduction for these payments of interest in the year they were paid.

*Decision will be entered under Rule 155.*