DENNIS H. WETTERHOLM AND GERALDINE A. WETTERHOLM ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wetterholm v. Commissioner
Docket Nos. 6081-81, 6082-81, 6163-81.
United States Tax Court
T.C. Memo 1986-189; 1986 Tax Ct. Memo LEXIS 420; 51 T.C.M. (CCH) 988; T.C.M. (RIA) 86189; May 8, 1986. Curtis Darling and George Manolakas, for the petitioners. Michael C. Cohen, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: *421 Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Petitioner
Year
Deficiency
6081-81
Dennis H. and Geraldine
1976
$16,667
A. Wetterholm
6082-81
David R. and Sarah
1976
5,390
J. Martin
6163-81
William F. and Helen
1976
7,663
V. Casteen
After concessions, the only remaining issue for decision is whether $60,327 paid by the Raintree Gardens partnership (the partnership) in 1976 as a discount and commitment fee to the Government National Mortgage Association (GNMA) may be fully deducted in the year paid. The outcome depends upon whether section 461(g)(1) [2] applies on these facts. If section 461(g)(1) is applicable, the GNMA fees paid by the partnership in 1976 must be capitalized and amortized over the life of the loan. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. All petitioners resided in Bakersfield, California when they filed the petitions *422 in these cases. Each of the petitioners is a limited partner in the Raintree Gardens partnership. The limited partnership agreement was executed by the various partners between May 24 and September 14 of 1976. Petitioners and the partnership are all cash basis taxpayers and report their income on a calendar year basis. The partnership was formed for the purpose of constructing and operating a 68 unit apartment project in Bakersfield, California. The land on which the project was to be constructed was obtained pursuant to an option acquired in 1974 by Robert Matsumoto (Matsumoto) through his wholly-owned company, Dynamic Properties of California, Inc.Dynamic Properties of California, Inc. was itself the general partner of Raintree Gardens. Following the acquisition of the parcel, Matsumoto contacted the mortgage banking firm of Molton, Allen & Williams, Inc. (Molton, Allen) of Birmingham, Alabama, with regard to obtaining financing for the project. Molton, Allen applied to the Department of Housing and Urban Development (HUD) for project mortgage insurance. The application for mortgage insurance was submitted on behalf of Matsumoto, the promoter of the project, because the *423 partnership did not come into existence until September of 1976. A conditional commitment was obtained from HUD in April of 1975. The conditional commitment obligates HUD to issue a firm commitment for mortgage insurance if the project develops in accordance with the specifications set forth in the application for the conditional commitment.On January 29, 1976, HUD issued a firm commitment to insure a mortgage of $1,340,600 for the Raintree Gardens project.HUD insures loans made by approved lenders under specified conditions and terms. HUD is not itself a lender, but instead plays the role of surety or guarantor to protect the mortgagee in the event of a later default by the borrower. In addition, on July 20, 1976, GNMA issued a commitment to purchase the loan when fully disbursed by the lender and fully insured by HUD. The commitments from HUD and GNMA were originally issued to Molton, Allen on behalf of the partnership.In August of 1976, the commitments from HUD and GNMA were assigned by Molton, Allen to United California Mortgage Company, a division of the United California Bank. [3] Finally, on September 30, 1976, United California Bank entered into a written loan agreement *424 with the partnership for a loan in the amount of $1,340,600 secured by a deed of trust. The term of the loan was 40 years. On its 1976 Federal income tax return, the partnership claimed an interest expense deduction in the amount of $96,495.06. In the notices of deficiency respondent disallowed $91,804.70 of that amount. The parties subsequently agreed that additional expense items totalling $31,477.70 should properly be capitalized and amortized over the 40-year term of the loan commencing September 30, 1976. The balance of the interest deduction claimed by the partnership in 1976 consisted of $60,327 in fees paid in connection with the GNMA commitment to provide permanent financing. Respondent asserts that section 461(g)(1) requires that these fees be capitalized and amortized over the full term of the loan. OPINION The Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520 which added section 461(g)(1) to the Code, provides that such section is not applicable to interest expenses paid pursuant to a binding contract or written loan commitment in existence on September 16, 1975. *425 Respondent asserts that no such binding contract or written loan commitment existed as of this date. Therefore, respondent argues that section 461(g)(1) applies to the GNMA fees paid by the partnership. Matsumoto acquired an undeveloped piece of property pursuant to an option. Matsumoto then initiated the process of obtaining permanent financing for a 68 unit garden apartment project on behalf of the partnership. On July 20, 1976, GNMA issued a commitment to purchase the loan after it was fully insured and after the loan funds had been disbursed. The partnership paid $60,327 in fees in order to obtain this permanent financing from GNMA. [4] On September 30, 1976, the partnership entered into a written agreement with United California Bank for a loan in the amount of $1,340,600. We must decide *426 whether the $60,327 in fees paid by the partnership are properly deductible in 1976. Respondent concedes that the fees paid to obtain GNMA's commitment to provide permanent financing were in the nature of interest. See Wilkerson v. Commissioner,655 F.2d 980 (9th Cir. 1981), revg. 70 T.C. 240 (1978); Goodwin v. Commissioner,75 T.C. 424 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); Baird v. Commissioner,68 T.C. 115 (1977). Respondent contends however that the GNMA fees must be capitalized and deducted over the full term of the mortgage. Section 163(a) provides that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. Interest is defined as compensation paid for the use or forebearance of money. Deputy v. duPont,308 U.S. 488 (1940). Section 461(g)(1) provides that cash basis taxpayers must capitalize prepaid interest and deduct it as if they were on the accrual method of accounting. [5] Thus, section 461(g)(1) requires that prepaid interest be allocated to the years in which the interest reflects a cost for *427 the use or forebearance of money. Cf. Beek v. Commissioner,80 T.C. 1024, 1029 (1983), affd. 754 F.2d 1442 (9th Cir. 1985); Zidanic v. Commissioner,79 T.C. 651, 654 (1982); Schubel v. Commissioner,77 T.C. 701, 703 (1981). Petitioners do not contest the effect that section 461(g)(1) would have if applied to the GNMA fees. Instead petitioners argue that these fees were paid in conjunction with a loan transaction that preceded the effective date of the provision. Section *428 461(g)(1) became effective as follows: (1) IN GENERAL.--Except as provided in paragraph (2), the amendment made by subsection (a) shall apply to amounts paid after December 31, 1975, in taxable years ending after such date. (2) CERTAIN AMOUNTS PAID BEFORE 1977.--The amendment made by subsection (a) shall not apply to amounts paid before January 1, 1977, pursuant to a binding contract or written loan commitment which existed on September 16, 1975 (and at all times thereafter), and which required prepayment of such amounts by the taxpayer. [Section 208(b), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1542. Emphasis added.] [6]
*429 It has been stipulated that the GNMA fees were paid prior to January 1, 1977. Thus, section 461(g)(1) will not apply if the fees were paid pursuant to a binding contract or a written loan commitment, which was in existence on or before September 16, 1975, (and at all times thereafter) and which required the prepayment of these fees by the partnership. The partnership did not enter into a binding contract with regard to the financing of the proposed apartment complex until September 30, 1976, when the loan was executed by United California Bank. Petitioners argue that although a binding contract did not exist, a written loan commitment was in existence on or before September 16, 1975. Petitioners contend that the transitional rule in the Tax Reform Act of 1976 referring to a written loan commitment entered into prior to September 16, 1975, relates to the stage in the lending process when both the lender and the borrower are, for all practical purposes, economically committed to the transaction. Petitioners argue that April 9, 1975, the date on which HUD's conditional commitment for project mortgage insurance was obtained, constituted the point at which all parties implicitly *430 agreed that a viable project existed. Conversely, respondent contends that the acquisition of the conditional commitment for project mortgage insurance does not constitute a "written loan commitment," because it does not warrant that a loan will ultimately be made. Respondent maintains that after receiving a conditional commitment a borrower still must negotiate a formal agreement with the lender. Furthermore, as of September 16, 1975, the loan in the instant case had not yet been approved by the bank's loan committee and the loan committee had the authority and the discretion to decline the loan. Thus, respondent argues that section 461(g)(1) should apply to the GNMA fees paid by the partnership and, as such, those fees must be amortized over the 40-year term of the loan. We agree with respondent. Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Petitioners must qualify under the specific rules and regulations imposed by Congress to properly claim a deduction. Deputy v. duPont,308 U.S. 488 (1940). Respondent's notice of deficiency is presumed correct, and petitioners have the burden *431 of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners cannot succeed in this action because they have failed to provide evidence of any document that was in existence on or before September 16, 1975, that could be construed as a written commitment to make a loan to the partnership. Indeed, the partnership did not begin its legal existence until after September 16, 1975. The limited partnership agreement for Raintree Gardens was executed by the various parties between May 24, 1976, and September 14, 1976. Cal. Code sec. 15502(1) (West 1984 Supp.) requires persons wishing to form a limited partnership to file a certificate detailing specified aspects of the partnership agreement. [7] The purpose of this requirement is to provide notice to the public of the limited liability assumed by the limited partners and of the relevant provisions of the partnership agreement. Brown v. Panish,99 Cal. App. 3d 429, 160 Cal. Rptr. 282 (1979). California Code section 15502(2) provides that a limited partnership is formed if there has been substantial compliance in good faith with the *432 statute. Cal. Code sec. 15502(2) (West 1984 Supp.). The facts indicate that the required certificate was not filed by the partnership until September 16, 1976. In a recent opinion, the Ninth Circuit held that substantial compliance requires more than a mere oral agreement. Mason v. Unkeless,618 F.2d 597 (9th Cir. 1980). The GNMA commitment to purchase the loan was not obtained until July 20, 1976. As respondent points out, it is not possible to have a written loan commitment requiring the payment of these fees prior to the date on which the commitment was actually secured. Petitioners, however, argue that the existence of a written loan commitment on September 16, 1975, should be viewed in a broader perspective according to common business and lending practices. According to petitioners, the date of the conditional commitment from HUD (April 9, 1975) was the time by which all the parties had agreed that the project was feasible. Petitioners' reasoning, however, *433 is incompatible with the statutory language set forth by Congress in the Tax Reform Act of 1976. The transitional language setting forth the effective date of section 461(g)(1) focuses on the existence, as of September 16, 1975, of either a binding contract or a written loan commitment. In either case, the appropriate focus is on the documented contractual relationship between the lender and the borrower. The fact that Matsumoto, as promoter, expended funds on behalf of the partnership prior to September 16, 1975, is not determinative. In addition, the conditional commitment issued by HUD on April 9, 1975, served only as an indication of the Government's intention to issue a firm commitment if the borrower's application indicated that the project was being developed in a manner consistent with the specifications set forth in the conditional commitment. [8]
In Sandor v. Commissioner,62 T.C. 469, 484 (1974), *434 affd. 536 F.2d 874 (9th Cir. 1976), this Court held that the lender's general commitment to make a loan is not a binding obligation to prepay interest. We see no need to delve into the California law of contracts to determine whether the parties entered into a binding contract prior to November 26, 1968. It is enough to note that the California courts recognize that preliminary negotiations leading up to the execution of a contract do not constitute a binding contract. There must be a meeting of the minds on all the material terms of an agreement before it can ripen into a contract. Whether the parties were merely negotiating a contract or entering into a binding contract is a question of intention. This is a question of fact to be determined by the Court from all the evidence. * * * [Citations omitted.] [9]
*435 According to the testimony of Michael Clancy, vice president of the United California Bank and originating loan officer for the Raintree Gardens project, the lender made no commitment, in writing or otherwise, prior to September 30, 1976, when the loan document itself was executed. In addition, Michael Clancy testified that the bank's practice was to delay seeking the approval of the loan committee until a firm commitment had been issued by HUD. This is because HUD potentially could refuse to insure the loan if some of the conditions were not fulfilled. Additionally, upon receipt of the firm commitment from HUD (January 29, 1976) the bank's loan committee still retained the authority to vote unfavorably on the partnership's loan application. During August of 1976 the commitments from HUD and GNWA were transferred by Molton, Allen to United California Mortgage Company, a division of United California Bank. Michael Clancy testified that as of August of 1976 when United California Mortgage Company become mortgagee of record, the decision of United California Bank to issue the loan remained contingent upon a favorable credit history with regard to Matsumoto. Michael Clancy further *436 indicated that he had no personal authority to commit the bank to the loan prior to obtaining approval from the loan committee. According to this testimony there was no loan commitment, written or otherwise, issued by the lender prior to September 30, 1976, when the bank entered into a formal loan agreement with the partnership. Petitioners recognize that the lender was not legally obligated to make the loan until the loan agreement was signed on September 30, 1976. Petitioners argue, however, that according to standard business and banking practices both the lender and the borrower presume that a loan will ultimately result once the conditional commitment is issued by HUD.Despite petitioners' assertion, however, the evidence clearly indicates that prior to September 16, 1975, there was no legal obligation on the part of United California Bank to issue the loan. We agree with respondent that the statutory language at issue was intended to provide taxpayers, the Commissioner, and the courts with a benchmark to avoid a circuitous inquiry into the subjective notions of business custom and banking policy. The selection of the effective date for new legislation is by its nature often *437 arbitrary. Such a selection often results in a seemingly harsh application of a sound legislative mandate. If Congress had wished to focus on an earlier stage in the lending process it would have done so. We can presume that the transitional language addressing prepaid interest paid pursuant to a written loan commitment existing on September 16, 1975, was drafted with an awareness that such language would be applied to transactions similar to the one before this Court. The conditional commitment issued by HUD indicates only that if the project develops in an acceptable manner, HUD will issue its firm commitment for mortgage insurance. The conditional commitment, however places no requirement on the lender and is unrelated to a commitment by the bank to make a loan requiring the prepayment of interest. petitioners have failed to present evidence of the existence of either a binding contract or a written loan agreement on the dates in question. Therefore, the $60,327 in GNMA fees must be capitalized and amortized over the term of the loan in accordance with section 461(g)(1). Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: David R. Martin and Sarah J. Martin, dkt. No. 6082-81; William F. Casteen and Helen V. Casteen, dkt. No. 6163-81.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
3. The United California Bank has since changed its name to First Interstate Bank of California.↩
4. Generally speaking, mortgage lenders are divided into primary and secondary lenders. Primary lenders such as United California Bank, are often unwilling to restrict their monies for the full term of the loan. In these circumstances, the lender can sell the mortgage in the secondary mortgage market to GNMA or one of the other secondary lenders. Wofford, Real Estate 409 (1983 rev.).↩
5. Sec. 461(g)(1) provides: SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION. * * * (g) PREPAID INTEREST.-- (1) IN GENERAL.--If the taxable income of the taxpayer is computed under the cash receipts and disbursements method of accounting, interest paid by the taxpayer which, under regulations prescribed by the Secretary, is properly allocable to any period-- (A) with respect to which the interest represents a charge for the use or forbearance of money, and (B) which is after the close of the taxable year in which paid, shall be charged to capital account and shall be treated as paid in the period to which so allocable.↩
6. The legislative history of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, describes the effective date of sec. 461(g) as follows: The rules in this provision apply generally to any prepayment of interest after September 16, 1975, in taxable years ending after that date. However, a transition rule excepts interest paid before January 1, 1976 (even if the taxpayer's taxable year ends after that date) if there existed on September 16, 1975, and at all times thereafter, either (1) a binding written contract for a prepayment of interest by the taxpayer, or (2) a written loan commitment for a loan to the taxpayer (requiring prepaid interest if the taxpayer takes the loan). In either of these situations, however, if the interest is paid on or after January 1, 1976, the payment will be subject to this provision. [H. Rept. No. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 793.] The only modification to the House version of the effective date provision set out above involves the cut-off date of January 1, 1976, which was changed to January 1, 1978 by the Senate. S. Rept. No. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 143. The House Conference Report indicates that a compromise was in fact reached and January 1, 1977, was ultimately agreed upon. H. Rept. No. 94-1515, (Conf.) 417 (1976).↩
7. Cal. Corp. Code sec. 15502 was repealed in 1981 and new sec. 15521 was added effective January 1, 1984. Sec. 15521 does not differ materially from former sec. 15502↩.
8. Robert Starr, former employee of Housing and Urban Development testified that the application for the conditional commitment would normally have had to be signed by the lender. This particular document, however, was not available for the Court's review.↩
9. In Sandor v. Commissioner,62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976), this Court discussed the applicability of Rev. Rul. 68-643, 1968-2 C.B. 76, to prepaid interest prior to the passage of the Tax Reform Act of 1976. See Anderson v. Commissioner,568 F.2d 386 (5th Cir. 1978), affg. a Memorandum Opinion of this Court; Cole v. Commissioner,64 T.C. 1091 (1975), affd. 586 F.2d 747 (9th Cir. 1978). Rev. Rul. 68-643 was premised upon the Commissioner's authority under sec. 446(b) to reject a taxpayer's method of accounting if it did not clearly reflect income. The ruling states that the Commissioner would consider any prepayment of interest for a period extending beyond the end of the current taxable year as materially distorting income. Rev. Rul. 68-643↩ was made applicable to a legal obligation incurred after November 26, 1968.