DANIEL N. POPE and FRANCES POPE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE
Pope v. Commissioner
Docket No. 6039-79.
United States Tax Court
T.C. Memo 1981-741; 1981 Tax Ct. Memo LEXIS 6; 43 T.C.M. (CCH) 234; T.C.M. (RIA) 81741; December 31, 1981. *6 On December 29, 1975, petitioner purchased an apartment complex for $ 2,600,000, giving a non-recourse note for the purchase price. On December 29, 1975, petitioner gave the seller a check for $ 182,000 for the interest accruing at 7 percent from December 29, 1975, to January 1, 1977. Petitioner received no income from the apartment complex in 1975. Held: The prepaid interest is not deductible in 1975. James Larimore, for the petitioners. Osmun R. Latrobe, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' 1975 Federal income tax in the amount of $ 76,753.30. After concessions by petitioners, [1] the only issue remaining is whether for the taxable year 1975, petitioners may deduct a prepaid interest expense. *7 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Daniel N. Pope (hereinafter petitioner) and Frances Pope, husband and wife, resided in Oklahoma City, Okla., at the time of filing the petition herein. They filed a joint Federal income tax return [2] for the taxable year 1975 with the Internal Revenue Service, Austin, Tex. Frances Pope is a party herein solely by reason of having filed a joint return. Petitioner purchased the Cottonwood Ridge Apartments (hereinafter Cottonwood), located in Norman, Okla., on December 29, 1975. The purchase price was $ 2,600,000, and it was stipulated by the parties that this price was not unreasonable when compared to the fair market value of Cottonwood at the time of purchase. The entire purchase price was financed by a nonrecourse note from petitioner to the seller, Colwell Mortgage Trust, now known as CMT Investment Trust *8 (hereinafter CMT), and was secured by a mortgage on Cottonwood. The note had a term of five years and required the payment of interest only during such term, with a balloon payment of principal and accrued interest due January 1, 1981. The interest rate charged was 7 percent per annum for the period from December 29, 1975, to January 1, 1977; then 8 percent until January 1, 1978, and thereafter 10 percent. Pursuant to the purchase agreement and the promissory note in respect thereof, when the sale closed on December 29, 1975, petitioner prepaid all the interest which was to accrue up to January 1, 1977, or $ 182,000. [3] It is the deduction of this payment which gives rise to the controversy herein. CMT had acquired Cottonwood by deed in lieu of foreclosure in July 1973. CMT had been the construction lender on the property. At the time of this acquisition, Cottonwood was approximately 70 percent completed. Thereafter, CMT hired the Tomack Construction Company (hereinafter Tomack) to complete the remaining 30 percent. Including the expenses incurred in this completion, CMT's total investment in Cottonwood was $ 2,750,000. Cottonwood consisted of *9 212 garden-type apartments and such additional amenities as a clubhouse, two swimming pools, a laundry building, a basketball court, a tennis court, and a putting green. CMT hired a management company to manage the apartments, and following their completion in March or April 1974, began renting the apartments. At the same time, it placed Cottonwood on the market for sale. CMT had numerous real estate business contacts in Oklahoma, and in an effort to sell Cottonwood, it prepared an offering sheet for circulation to such contacts. The offering listed the sales price at $ 2,800,000, and stated that CMT was willing to make a loan to facilitate the sale. On April 23, 1975, Jerry Womack (hereinafter Womack) made an offer to purchase Cottonwood, which was, for the most part, acceptable to CMT. Womack was familiar with Cottonwood, since he was Chairman of the Board of Tomack, the company which completed its construction. He was in the business of developing and managing income-producing properties such as Cottonwood. Due to poor construction of the first 70 percent of Cottonwood, to an inadequate rent structure, and to incapable management, Cottonwood was generating a negative cash *10 flow. Womack was aware of the nature and extent of most of these problems and believed he could make it a profitable investment. The offer proposed by Womack included a purchase price of $ 2,600,000, the entire amount of which was to be financed by CMT. Womack was to give CMT a nonrecourse note for the entire amount, having a term of 36 months and secured by a mortgage on Cottonwood. The interest rate to be charged would be 7 percent for the first year; 8 percent for the second; and 10 percent for the third. Additionally, Womack would pay $ 100,000 of the first year's interest charge at the time the sale closed, which was to be no later than June 30, 1975. This offer by Womack, however, was ultimately rejected by CMT because of a provision which provided that if the cash flow from Cottonwood was not sufficient to meet the interest payment requirements, the unpaid interest would accrue and be payable at the time the note matured, and be cause 100 percent financing was not then acceptable to CMT. On October 9, 1975, Womack made a new offer to purchase Cottonwood. This offer contained essentially the same terms as his offer of April 23, 1975, but stated that Womack would prepay *11 $ 178,000 of the first year's interest charge at the time the sale closed. This offer was equally unacceptable by CMT for the same reasons as stated above. Womack included the provision for the prepayment of interest in both of the offers made to CMT because, in his view, a prepayment of interest was more advantageous than making a down payment when purchasing a project which was generating a negative cash flow. [4]
Although both of Womack's offers to purchase Cottonwood were $ 200,000 [5] below the asking price of CMT, such price was acceptable to it. The real estate market at this time was not good and CMT was acquiring numerous properties by way of foreclosure. Moreover, due to inadequate construction, Cottonwood was in constant need of repair. The occupancy of *12 Cottonwood was dependent upon students from the University of Oklahoma and fluctuated from 100 percent during the school year to 60 percent during the summer months. As a result of all these factors, CMT was receiving only a 4-1/2 to 5 percent return on its investment, which it did not consider to be acceptable. By selling Cottonwood and providing financing to Womack at interest rates of 7 percent of more, an acceptable return could be achieved. CMT, therefore, was willing to sell Cottonwood to Womack at a loss of $ 150,000, [6] because it believed he was a competent manager and that Cottonwood, under his supervision, would generate enough income to ensure that the interest payments on any financing provided would be paid. In 1975, petitioner received $ 171,120 from the sale of stock in the Farm and Financial Co., which resulted in a recognized gain of $ 160,387. Petitioner decided to invest these funds in real estate, and his attorney put him in contact with a real estate broker in Dallas, who in turn put him in contact with Womack. *13 After a meeting between petitioner and Womack, it was decided that Womack would make an offer to purchase Cottonwood on behalf of petitioner, and if the offer was accepted, petitioner would lease Cottonwood to Womack. Womack favored structuring the transaction in this fashion because it gave him effective control of Cottonwood, without the initial financial burden required by a purchase. Thereafter, on December 5, 1975, Womack, on behalf of petitioner, offered to purchase Cottonwood for $ 2,600,000, under essentially the same terms as his previous two offers, including a provision that CMT finance the entire purchase price. The offer specifically provided that the sale must close no later than December 31, 1975. This offer, however, did not include a provision that unpaid interest be added to the balance of the promissory note and paid at maturity. CMT accepted the offer. Pursuant to the "Promissory Note" executed in respect of petitioner's purchase, interest was payable as follows: Interest at the rate of seven percent (7%) [7] per annum shall commence to accrue on the date hereof [December 29, 1975]. The interest rate shall increase effective the first day of January, 1977 to *14 eight percent (8%) per annum and shall increase again effective the first day of January, 1978 to ten percent (10%) per annum. [8]
Principal and interest shall be paid as follows: (a) Interest in advance in the amount of $ 182,000.00 shall be paid on the date hereof. [9] (b) Interest only, at the rates hereinabove set forth shall be paid monthly *15 commencing on the first day of February, 1977 and on the first day of each calendar month thereafter, to and including the first day of January, 1981. (c) The entire unpaid principal and accrued interest shall be due and payable on the first day of January, 1981. The sale of Cottonwood to petitioner closed on December 29, 1975, at which time he paid CMT $ 182,000 as interest on the promissory note. All of the negotiations for this sale were between Womack, who represented petitioner, and CMT, who had no contact with petitioner prior to the time the sale closed. Womack approached these negotiations as if he were the purchaser of Cottonwood. CMT would not have agreed to sell Cottonwood to petitioner without a provision that the property be leased to Womack, who was well known in Oklahoma for his expertise in property management. A provision for this was included in the contract of purchase. [10]
Earl Clark (hereinafter Clark), a senior vice president of CMT, stated that a provision for prepaid interest was common in most real estate sales during 1975, as was the closing of a sale just prior to the *16 end of the year. CMT was in favor of closing the sale of Cottonwood before December 31, 1975, because it allowed them to indicate an earning asset on their books as of the first part of 1976, rather than unprofitable real estate. [11] Clark also stated that CMT would not have sold Cottonwood without receiving some payment at closing, although it was not concerned with whether the payment was in the nature of a down payment or prepaid interest. However, since the terms proposed to and agreed by CMT did not provide for a down payment, the prepayment of interest was essential. CMT did not have a set policy for refunding prepaid but unaccrued interest in the event of the prepayment of principal. The decision to refund the interest would be made by senior officials of CMT. The promissory note, which was prepared by attorneys for CMT, provided that petitioner could prepay any or all of the principal owing without penalty, but made no mention of a refund in the event of such a prepayment. However, at no time was the principal prepaid by petitioner, *17 nor did he ever contemplate such prepayment. Simultaneously with the closing of the sale, petitioner leased Cottonwood to Womack for a term of 30 years. This was a "net" lease whereby Womack was responsible for all expenses incurred in connection with Cottonwood, such as repairs, maintenance and real estate taxes. Womack was to pay petitioner $ 25,000 per year as rent beginning in 1976 and, beginning in 1977, was to pay an additional amount equal to the amount of petitioner's interest payments to CMT. No rent was required for 1975. [12]
Petitioner considered the purchase of Cottonwood as a good investment for many reasons. First, he was guaranteed a 12-1/2 percent yearly return on this investment. Petitioner initially invested a total of $ 200,000, $ 182,000 *18 as prepayment of interest and $ 18,000 in brokerage fees. As noted above, petitioner paid no expenses in connection with Cottonwood, and received as rent $ 25,000 plus, beginning in 1977, an amount equal to his interest payments made to CMT. Therefore, he was sure to net $ 25,000 on his initial investment each year, thereby generating a 12-1/2 percent return. [13] Second, Cottonwood had the potential to greatly increase in value and, third, the depreciation and interest deductions would provide favorable tax advantages. [14]
Petitioner's adjusted gross income for the taxable year 1975, as reported on his return, was $ 36,390. For the taxable years 1974 and 1976, the adjusted gross income as indicated on his returns of such years was $ 52,476 and $ 15,443, [15] *19 respectively. For the taxable year 1975, petitioner deducted $ 138,950 [16] of the $ 182,000 prepaid interest expense. Respondent disallowed this deduction in its entirety. OPINION The issue for decision is whether petitioner may deduct in the taxable year of payment, 1975, a prepaid interest expense which accrued in the following year, 1976. Respondent disallowed petitioner's deduction of the prepaid interest on two grounds. First, that the "payment" of interest was in actuality a "deposit," to be applied to interest when it subsequently accrued. In support of this he asserts that the prepayment was refundable in the event of a prepayment of principal. Second, even if a prepayment of interest did occur, to allow the deduction in 1975, rather than the year in which it accrued, 1976, would, under the circumstances herein, materially distort income in contravention of section 446(b). [17] He supports this argument with the following general assertions: the *20 deduction would result in a large degree of income distortion for 1975; the year of payment contained at most only three days of the period in which the interest was to accrue; and the substantial, if not sole, motivation for the timing of the payment was tax avoidance. Furthermore, respondent asserts that the prepayment created an asset having a useful life extending substantially beyond the close of the taxable year 1975 and the expense for such asset should be allocated over the period for which it relates. Petitioner maintains first, that the prepayment was not in actuality a deposit. He asserts that the prepayment of interest was not refundable in the event of the prepayment of principal, and even if it was, there was no likelihood that the principal would be prepaid. Second, he claims that because he is a cash basis taxpayer he is entitled to deduct the prepaid interest in the year paid, irrespective of the fact that it had not yet accrued. It is his position that the deduction did not materially distort his 1975 income. He asserts that the prepayment of *21 interest arises out of a bona fide business transaction which was negotiated at arm's length, and that the prepayment of interest was for legitimate business purposes. Furthermore, he claims that since the amount actually deducted represented approximately 9 months of interest, the expenditure did not create an asset having a useful life which extends substantially beyond the taxable year 1975. We note at the outset that this case does not involve the deductibility of interest in a sham transaction wherein no true indebtedness existed, which was entered into solely for the economic benefit to be derived by petitioner from the interest deduction. [18] See Knetsch v. United States, 364 U.S. 361 (1960); Barrett v. Commissioner, 364 F.2d 742 (2d Cir. 1966), affg. 44 T.C. 261 (1965). Nor does it involve a loan arrangement which gives rise to a valid indebtedness, but which has no purpose, substance or utility apart from its anticipated tax consequences. See Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965). The transaction herein giving rise to the debt was the purchase of Cottonwood, which had economic reality, was entered into for legitimate business *22 purposes and gave rise to a valid indebtedness. We do find, however, that the only reason the interest for 1976 was prepaid on December 29, 1975, was to give petitioner the benefit of a large deduction for interest in a year in which his income was quite high. See Sandor v. Commissioner, 62 T.C. 469, 474 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). Section 163(a) provides that "There shall be allowed as a deduction, all interest paid or accrued within the taxable year on indebtedness." It is well established that this section must be read in the light of sections 446(b)[19] and 461[20] and the regulations thereunder. Sandor v. Commissioner, supra at 477; Baird v. Commissioner, 68 T.C. 115 (1977). While generally speaking, a cash basis taxpayer may deduct interest *23 in the year paid, the timing of such deduction is subject to the requirement that it not materially distort income. [21]Cole v. Commissioner, 586 F.2d 747 (9th Cir. 1978), affg. 64 T.C. 1091 (1975). Burck v. Commissioner, 533 F.2d 768 (2d Cir. 1976), affg. 63 T.C. 556 (1975); Sandor v. Commissioner, supra.The Commissioner has broad powers and discretion in determing whether the accounting method employed by a taxpayer clearly reflects income. Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Fort Howard Paper Co. v. Commissioner, 49 T.C. 275 (1967). In this regard, the accounting method employed includes "the accounting treatment of any item." Sec. 1.446-1(a)(1), Income Tax Regs.; Sandor v. Commissioner, supra; Baird v. Commissioner, supra.Courts will not overturn the Commissioner's determination unless there is clear evidence that he has abused his discretion. Schram v. United States, 118 F.2d 541 (6th Cir. 1941); Drazen v. Commissioner, 34 T.C. 1070 (1960). The taxpayer has a heavy burden of proof in establishing that the Commissioner abused his discretion. Fort Howard Paper Co. v. Commissioner, supra.Based on all the evidence presented, we conclude that petitioner has failed *24 to meet this burden, and hold for respondent. [22]
In determining whether the deduction of a prepaid expense materially distorts *25 income, various factors are given consideration. The effect of the deduction on the current year's income, the extent to which the prepayment period falls in the year of deduction, the existence of non-tax-avoidance purposes for the prepayment, the amount of income reportable in the year of deduction, the availability of deductions in later years, and whether the prepayment was required, are all factors which have been considered in making a determination of whether a prepayment of interest clearly reflects or distorts income. [23] *26 See Sandor v. Commissioner, supra; Burck v. Commissioner, supra; Cole v. Commissioner, supra; Baird v. Commissioner, supra; Anderson v. Commissioner, 568 F.2d 386 (5th Cir. 1978), affg. a Memorandum Opinion of this Court; Lewis v. Commissioner, 65 T.C. 625 (1975). Applying these and other factors to the circumstances in this case leads inexorably to the conclusion that the deduction of the prepaid interest in 1975 did not clearly reflect income. The interest deduction had a significant impact on petitioner's taxable income for the year 1975, which as we have found, was the purpose for the prepayment. On his income tax return filed for 1975, petitioner reported adjusted gross income of $ 36,390. Absent the deduction for prepaid interest, this figure would have been $ 175,300. [24] Moreover, the adjusted gross income reported on petitioner's 1974 and 1976 income tax returns were substantially lower than this, at $ 52,480 for 1974 and $ 15,443 [25] for 1976. The prepaid interest was for one full year. [26] Yet there were only three days remaining in 1975 when the interest was paid, *27 less than 1 percent of the period for which the interest was prepaid. It would appear, in fact, that the amount prepaid, being exactly 7 percent on $ 2,600,000, was interest for the period January 1, 1976, to December 31, 1976, and did not include any interest for the three remaining days in 1975. The lease of Cottonwood to Womack provided that no rental was due for 1975 and no depreciation of Cottonwood was claimed on petitioner's tax return for 1975. The contract for sale of Cottonwood required the prepayment of interest. However, it was Womack, on behalf of petitioner, not CMT, who had negotiated the prepayment provision as part of the contract. CMT did not require that it be paid interest at the time of closing, but rather, only that it be paid either a down payment or interest. Nothing else, either income-wise, deduction-wise, or tax-wise, occurred in the year 1975 as a result of the Cottonwood transaction except the prepayment of the interest. Petitioner has offered no explanation of why the first year's interest could not have just as well been paid in 1976, to which it was applicable, as in 1975. By taking the deduction in 1975 petitioner *28 could offset a large and somewhat unnusual amount of taxable income, and that is the only reason we find for the prepayment of the interest in 1975. The deduction of the prepaid interest in 1975 clearly resulted in a distortion of income for that year and did not clearly reflect income. Burck v. Commissioner, supra.
Even if petitioner had a business reason for the prepayment, we find that the timing of such prepayment was for tax avoidance purposes alone. Certainly it is true that a taxpayer is free to structure a transaction so as to minimize his taxes. However, the structure must not result in a distortion of income. In the context of prepaid interest, the structuring must be tempered by the Commissioner's authority under section 446(b) to change the taxpayer's method of accounting with respect to a material item, such as the timing of a deduction, in order to clearly reflect income. See Sandor v. Commissioner, supra at 478-479. In view of the above, we find that petitioner has not overcome his heavy burden to show that the respondent abused his discretion when he determined that the deduction of $ 138,910 for prepaid interest in 1975 did not clearly reflect income. Neither does *29 the Commissioner contend, nor do we find, that petitioner may not deduct the prepaid interest in the year to which it is allocable, presumably 1976. In determining whether the deduction of a prepaid expense materially distorts income, we have recently held that the existence of a "substantial legitimate business purpose" for the prepayment satisfies the requirement under section 446(b) that a taxpayer's method of accounting clearly reflect income. Van Raden v. Commissioner, 71 T.C. 1083, 1106 (1979) (Court reviewed), affd. on other grounds 650 F.2d 1046 (9th Cir. 1981). In that case, the issue presented was the deductibility of a prepaid cattle fee expense and we specifically found that the prepayment was made for a business reason, to wit, obtaining a lower price for the feed purchased. In the instant case, the prepaid expense is interest rather than cattle feed, and we have found no business purpose for the prepayment. Petitioner asserts that the purpose for prepaying interest in 1975 was to free the cash flow generated from the apartments during 1976 from the interest payment requirements so as to be used for the repair and improvement of Cottonwood. We fail to see how, even *30 if such assertion were true, it would benefit petitioner. It was Womack, as lessee, not petitioner, who was responsible for repairing and maintaining Cottonwood. Womack was to receive the rental income from rental of the individual apartment units, and was concerned that the income would be less than the expenses he would incur in connection with Cottonwood. Petitioner was to receive a flat $ 25,000 per year rent from Womack, plus an amount equal to his yearly interest payment requirements to CMT beginning on January 1, 1977, and was responsible for none of the expenses incurred in connection with Cottonwood. [27] *31 No evidence was presented as to how the alleged benefit which Womack received by petitioner's prepayment of interest inured to the benefit of petitioner. [28] Moreover, we note that petitioner received no benefit by prepaying, such as savings in his interest payment obligation. The prepayment was only of the interest accruing to January 1, 1977, and the rate of interest charged up to that time was 7 percent; it was not until such date that the rate of interest increased to 8 *32 percent. Based on all the evidence presented and the record as a whole, we cannot find that petitioner had a substantial legitimate business purpose for making the prepayment of interest. Decision will be entered for the respondent. Footnotes
1. The largest of these concessions involved a capital gain in the amount of $ 311,015.62. Petitioners did not report this on their 1975 income tax return because they mistakenly believed the transaction giving rise to the gain occurred on Jan. 1, 1976. The gain was the result of the foreclosure on stock of the New Bridge Capital Corporation which petitioner had pledged as security for a loan.↩
2. Throughout the taxable year 1975, petitioners maintained their books and records and filed their Federal income tax return on the cash receipts and disbursements method of accounting.↩
3. 7% X $ 2,600,000 = $ 182,000↩
4. Womack's contention was essentially that by making a prepayment of interest rather than a down payment, the initial capital outlay for the purchase would be less while the same amount of deductions would be generated, thereby improving the cash flow. This view assumes that if the initial payment had been designated as a down payment, interest payment on the note would still be required during the first year of ownership.↩
5. The asking price was $ 2,800,000 and the price offered was $ 2,600,000.↩
6. The total investment by CMT of $ 2,750,000 less the $ 2,600,000 purchase price.↩
7. The total amount of interest charged from Dec. 29, 1975, to Jan. 1, 1977, was $ 182,000, or exactly one year's worth of interest at the rate of 7 percent on $ 2,600,000. Therefore, although the promissory note states that interest was to accrue "on the date hereof" (Dec. 29, 1975), from what we can perceive, no interest was charged from Dec. 29, 1975, to Jan. 1, 1976. ↩
8. The initial rate was below the then current market rates for the specific purpose of attracting a purchaser. The rates were to thereafter escalate so as to encourage the purchaser to refinance the note through a commercial lender. However, the market rates were also increasing during this time and were never below that required by this promissory note.↩
9. The prepayment of interest in the amount of $ 182,000 was part of the offer for purchase and was a term of the contract for sale.↩
10. All of the documents for the sale of Cottonwood were prepared by attorneys for CMT.↩
11. The prepaid interest was included in CMT's income as it accrued during 1976, but of course this treatment of the interest by CMT is not before us.↩
12. At the time petitioner acquired Cottonwood, he maintained a "hazard insurance" policy for the property with a limit of $ 3,198,070. However, pursuant to the lease, Womack, at his sole cost and expense, was to maintain "fire and extended coverage insurance" and "public liability insurance" with a limit of at least $ 1,000,000. Moreover, Womack was responsible for any damage caused by "fire, windstorm, or other casualty."↩
13. 12-1/2% X $ 200,000 = $ 25,000 ↩
14. Womack prepared a projection of the return on petitioner's investment during his negotiations with petitioner which indicated the expected return for the first 12 years of ownership. For the first 8 of these years, the predominant source of funds in the return on investment was from the reduction in his taxes, rather than the receipt of rental income.↩
15. The adjusted gross income for 1976 was calculated in part by deducting $ 194,090 as depreciation in connection with Cottonwood.
16. The entire amount of the payment was not deducted because of the limitation on the deduction of investment interest provided in sec. 163(d)↩.
17. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year 1975.↩
18. The issue presented under the facts herein is now somewhat academic. In the Tax Reform Act of 1976, sec. 461(g)(1)↩ was added, and generally provides that for taxable years beginning after Dec. 31, 1975, a cash basis taxpayer is required to deduct the prepaid interest over the period of the loan to the extent the interest represents the cost of using the borrowed funds during each period to which it is allocable.
19. Sec. 446(b) provides: (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under suhc method as, in the opinion of the Secretary of his delegate, does clearly reflect income. ↩
20. Sec. 461(a) provides: (a) General Rule.--The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. ↩
21. See Anderson v. Commissioner, 568 F.2d 386↩ (5th Cir. 1978), affg. a Memorandum Opinion of this Court. 22. In view of our holding herein, we do not decide whether the payments were in actuality a deposit to be applied against interest in the future. See Sandor v. Commissioner, 62 T.C. 469, 477 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). Nor do we decide whether the prepayment created an asset having a useful life extending beyond the close of the taxable year 1975. See sec. 1.461-1(a)(1), Income Tax Regs.↩
23. These factors by no means represent an exclusive list. Furthermore, the Commissioner provided the following factors as helpful guidelines in making a determination of this issue: the amount of income in the taxable year of payment, the income of previous taxable years, the amount of prepaid interest, the time of payment, the reason for prepayment, and the existence of a varying rate of interest over the term of the loan. Rev. Rul. 68-643, 1968-2 C.B. 77. These factors are, however, advisory only, and do not carry the force of law. Burck v. Commissioner, 533 F.2d 768 (2d Cir. 1976), affg. 63 T.C. 556, 561↩ (1975).
24. $ 36,390 + $ 138,910 = $ 175,300 ↩
25. Petitioner claimed a depreciation deduction on Cottonwood of $ 194,090 in 1976, which could have been anticipated.↩
26. $ 2,600,000 X 7% = $ 182,000↩
27. From what we can determine, this includes all insurance expenses as well. Pursuant to the lease, Womack was to provide "fire and extended coverage" and public liability insurance, and was responsible for any damage caused by "fire, windstorm, or other casualty." Therefore, even though petitioner maintained hazard insurance on Cottonwood at the time of its acquisition, this responsibility was passed on to Womack pursuant to their lease. 28. Furthermore, we are not convinced that Womack, as lessee, accomplished his stated purpose by petitioner's prepaying the interest. He claimed that by the prepayment of the interest, no interest payments would be required during 1976, and thus more cash would be available for investment in Cottonwood. It is true that the lease required Womack to pay as rent, inter alia↩, an amount equal to petitioner's yearly interest payments to CMT. However, as noted herein, these payments were not to begin until January 1, 1977. The prepayment of interest in 1975 did not require a concomitant payment of rent by Womack. In fact, the lease specifically provided that no rent was owed for 1975 and only $ 25,000 was owed for 1976. Thus, the prepayment cannot be said to have generated more funds for the repair, maintenance and improvement of Cottonwood during 1976.